# YANKTON SIOUX TRIBE OF INDIANS *v.* UNITED STATES.

### CERTIORARI TO THE COURT OF CLAIMS.

No. 250.   Argued October 7, 1926.—Decided November 22, 1926.

1. Where promises are in the alternative,. the fact that one of them is at the time, or subsequently becomes, impossible of performance does not, without more, relieve the promisor from performing the other.   P. 358.
2. In an agreement, ratified by Congress in 1894, by which the Yankton Sioux Indians made a large cession of lands to the United States, it was stipulated, in part consideration for the cession and with respect to a small tract of other land containing pipe-stone quarries which were long claimed by the Indians under a Treaty of 1858 with encouragement from Congress, (1) that if the Government questioned their ownership of that reservation, including the fee of the land as well as the right to work the quarries, the Secretary of the Interior should as speedily as possible refer the matter to the Supreme Court of the United States for decision, and (2) that if this were not done within one year from the ratification of the agreement by Congress, such failure, on the part of the Secretary, should be a waiver by the United States of all rights to the ownership of such pipe-stone reservation, and the same should thereafter be solely the property of the tribe. The

Secretary, believing the provision for securing a decision of the Court was beyond the power of Congress, and being advised by the Attorney General that it was impracticable, made no attempt to carry it out. The land ceded was opened to settlement by the Government and passed largely into the possession of innocent purchasers, making restoration of the *status quo ante* impossible. In view of the equities growing out of these facts, *Held*, that the second of the alternative stipulations was enforceable even if the first was not. P. 356.

61 Ct. Cls. 40, reversed.

CERTIORARI (270 U. S. 637), to review a judgment of the Court of Claims rejecting the claim of the above named tribe of Indians for compensation for a tract of land in Minnesota embracing the Red Pipe Stone Quarries, which had been appropriated by the United States. See also, 53 Ct. Cls. 67, 81.

*Mr. Jennings C. Wise* for the petitioners.

*Solicitor General Mitchell* for the United States, was unable to support the reasoning of the Court of Claims, but he felt constrained to present the case fully in deference to the views of that Court and to the evident desire in Congress to have a judicial settlement of the controversy.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

By § 22 of the Indian Appropriation Act of April 4, 1910, c. 140, 36 Stat. 269; 284, jurisdiction was conferred upon the Court of Claims " to hear, and report a finding of fact, as between the United States and the Yankton tribe of Indians of South Dakota as to the interest, title, ownership and right of possession of said tribe " to a tract of land lying in the State of Minnesota embracing the Red Pipestone Quarries. That court, narrowly construing its powers, reported to Congress findings of fact without passing upon the question of title or determining any issue of law. 53 Ct. Cls. 67, 81. Congress subse-

quently, on June 3, 1920, c. 222, 41 Stat. 738, conferred upon the same court jurisdiction to adjudicate all claims of the Sioux Indians against the United States, and under that Act these Indians filed their petition in this proceeding praying judgment for an amount which would compensate them should it be found that the land in question had been misappropriated by the defendant. On January 9, 1925, while the case was pending, jurisdiction was conferred more definitely upon the same court to determine from the findings of fact theretofore made " the interest, title, ownership, and right of possession of the Yankton Band of Santee Sioux Indians in and to the land known as the ' Red Pipestone Quarries,' " and thereupon to determine, and enter judgment for, the amount " legally and equitably due from the United States " to petitioner for the same. c. 59, 43 Stat. 730. That court, in addition to its previous findings of fact, has now found that the Indians had been and still are permitted freely to visit and procure stone from the quarries and that they are free to do so as long as they may desire. Concluding that under the Treaty of 1858, 11 Stat. 743, the only interest possessed by the tribe in the quarries was this right, which had never been denied, the court dismissed the petition. 61 Ct. Cls. 40.

By the Treaty of 1858, these Indians ceded to the United States all the lands then owned, possessed, or claimed by them, wherever situated, except a particularly described tract of 400,000 acres. In consideration of that cession, among other things, the United States agreed (Art. VIII, p. 746) that " The said Yancton Indians shall be secured in the free and unrestricted use of the Red Pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes; and the United States hereby stipulate and agree to cause to be surveyed and marked so much thereof as shall be necessary and proper for that purpose,

and retain the same and keep it open and free to the Indians to visit and procure stone for pipes so long as they shall desire." In accordance with this agreement, the tract here in question, containing about 648 acres, was so surveyed and marked.

It is quite clear from all the surrounding circumstances that the Indians understood that by this provision there was granted to them full ownership of the tract; and their claim to that effect they have always persistently and stoutly maintained. The validity of that claim the Government has sometimes denied, and at other times apparently conceded. One conspicuous example of the latter character may be cited. In 1389 (c. 421, 25 Stat. 1012) Congress provided for the appraisement of the tract and the ascertainment of the actual value of a strip of land upon it then occupied by a railway company and the damage to the remainder of the tract by reason of the taking of the strip for railroad purposes. As a result of this legislation, $1,740.00 was collected from the railroad company and paid to the Indians. By the same Act it was provided that no part of the tract should be sold without the consent of a majority of the adult male members of the tribe, and that the proceeds of sales should be credited to the annuity fund of the Indians or expended according to their determination.

Nevertheless, the extent and character of the interest of the Indians has continued to be more or less in controversy. In 1891 (c. 240, 26 Stat. 764) provision was made for establishing Indian industrial and training schools in Minnesota, Michigan and Wisconsin, that in Minnesota to be located on the Quarry tract. Under this Act a school was established on the tract and opened early in 1893, possession being taken, it is conceded, of the entire tract. In the meantime, negotiations with the Indians had resulted in an agreement for the cession of an additional 150,000 acres of land, which agreement was

ratified by Congress in 1894.  c. 290, 28 Stat. 314.  In part consideration of the cession, the agreement contains the following article:

"Article XVI. If the Government of the United States questions the ownership of the Pipestone Reservation by the Yankton Tribe of Sioux Indians, under the treaty of April 19th, 1858, including the fee to the land as well as the right to work the quarries, the Secretary of the Interior shall as speedily as possible refer the matter to the Supreme Court of the United States, to be decided by that tribunal. . . .

" If the Secretary of the Interior shall not, within one year after the ratification of this agreement by Congress, refer the question of the ownership of the said Pipestone Reservation to the Supreme Court, as provided for above, such failure upon his part shall be construed as, and shall be, a waiver by the United States of all rights to the ownership of said Pipestone Reservation, and the same shall thereafter be solely the property of the Yankton tribe of the Sioux Indians, including the fee to the land."

Concluding that the provision for referring the matter to this Court was beyond the constitutional power of Congress, the Secretary made no attempt to carry that part of the article into operation beyond submitting the question for the opinion of the Attorney General.  That officer advised that compliance with it was impracticable. There the matter rested until 1897, at which time Congress, apparently on the theory that the Indian title had vested under the second paragraph of the article, by reason of the failure of the Secretary to refer the matter to this Court under the first paragraph, directed the Secretary of the Interior to negotiate with the Indians for the purchase of the land.  c. 3, 30 Stat. 62, 87.  Negotiations were had with the Indians and an agreement made for the transfer of their interests to the United States for the sum of $100,000, which agreement was transmitted to

Congress and referred to the Senate Committee on Indian Affairs. A majority of the committee reported adversely, but no action upon the report or upon the matter appears to have been taken by Congress. The acts of legislation and the proceedings in the Court of Claims followed as already outlined.

The lower court held, first, that the right reserved to the Indians by the Treaty of 1858 was a mere easement and this the Government had not interfered with; and, second, that Article XVI did not operate to enlarge this right but was a mere direction to refer the question of title to this Court, and, since that involved an unconstitutional attempt to extend the original jurisdiction of the Court, the provision on its face was impossible of performance and, therefore, void.

We pass the first ground without considering it, and come at once to the second. To begin with, it is not clear that the undertaking to refer the question to this Court was impossible of performance. The Attorney General, to whom the question was referred by the Secretary of the Interior, advised only that it was "impracticable." That it could not have been referred directly to this Court is obvious, since that would have been to invoke an original jurisdiction which the Court cannot exercise under the Constitution. But the matter might have gone to an inferior court and have been brought here by appeal, necessary legislation to that end, so far as required, being provided. Such a process, if it would not have satisfied the letter, would, at least, have satisfied the purpose of the provision. See *The Harriman,* 9 Wall. 161, 172–173; *Beebe* v. *Johnson,* 19 Wend. 500.

We prefer, however, to rest our decision upon other considerations. The Pipestone Quarries are of great antiquity. There the tribes, from time immemorial, have been wont to gather, under solemn truce, to quarry the stone, which is of a quality and texture not found else-

where, and mold it into pipes—the Indian symbols of peace. A great store of Indian myth and legend is associated with the spot; and it always has been regarded by the tribesmen with sentiments bordering upon religious reverence. While transferring to the United States their possessory title to other lands, the Indians had steadfastly refused to surrender what they conceived to be their peculiar right to this tract. Under these circumstances, it is by no means certain that they would have agreed to the cession at all without the provision in question. However that may be, it cannot be doubted that they regarded the undertaking of the Government set forth in Article XVI, as of great value, accepted it in good faith, and relied with the utmost confidence upon the alternative promise of Congress that in the event the matter was not referred to this Court all claims of the Government to the ownership of the tract would cease and the Indian title in fee be conclusively established.

To deny all efficacy to that part of the undertaking upon the ground that the other part was impossible of performance, and at the same time hold these wards of the Government to the terms of the cession for which the undertaking formed so important an element of consideration, would be most inequitable, and utterly indefensible upon any moral ground; and this is peculiarly true in view of the attitude of Congress in so dealing with the matter from time to time, as hereinbefore recited, as to justify a belief on the part of the Indians that their ownership was conceded. It is impossible, however, to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers; and nothing remains but to sanction a great injustice or enforce the alternative agreement of the United States in respect of the ownership of the Indians. The latter course is so

manifestly in accordance with ordinary conceptions of fairness that it would be unfortunate if any positive rule of law stood in the way of its accomplishment. We are of opinion that none exists. The judgment of the Court of Claims, that such an obstruction is to be found in the conclusion that the provision for referring the controversy to this Court was legally impossible of execution, cannot be sustained.

The general rule undoubtedly is, that where there is a legal impossibility of performance appearing on the face of the promise there is no contract in respect of it. But here the undertaking of the Government is in the alternative—that either the question of the title of the Indians shall be referred to this Court for determination, or, in default of that being done, title in fee shall vest in the Indians. Granted the impossibility of the first alternative, the Government, nevertheless, took the risk, and must, in accordance with its definite undertaking to that effect, suffer the stipulated consequence, in virtue of the principle that, where promises are in the alternative, the fact that one of them is at the time, or subsequently becomes, impossible of performance does not, at least without more, relieve the promisor from performing the other.

In *Stevens* v. *Webb,* 7 Car. & P. 60, 62, the defendant gave a bond in the sum of 35*l* to obtain the release of a prisoner held in custody on a *ca. sa.,* conditioned to surrender him at a time fixed. The court held the condition void on the ground that a defendant in execution, once discharged out of custody by the plaintiff, could not by law be retaken upon that judgment, but, nevertheless, enforced payment of the penalty, saying: " There was therefore one branch of the agreement that the defendant could not perform; and the law is, that, if an agreement is in the alternative, and one branch of the alternative cannot be performed, the party is bound to perform the other, which, in this case, is to pay 35*l*." There is an

earlier decision, rendered in 1798 in the Court of Common Pleas, upon exactly similar facts, to the same effect. *Da Costa* v. *Davis,* 1 Bos. & P. 242. In *Drake* v. *White,* 117 Mass. 10, 13, *Stevens* v. *Webb, supra,* was cited as authority for the proposition that, where one part of an alternative promise, originally possible, has subsequently become impossible of fulfilment, the other part of the alternative must nevertheless be performed. See also *Mill Dam Foundery* v. *Hovey,* 21 Pick. 417, 443; *State* v. *Executors of Thomas Worthington,* 7 Ohio 171, 173; *Jacquinet* v. *Boutron,* 19 La. Ann. 30, 32.

That the United States has taken and holds possession of the entire Quarry tract of 648 acres is not in dispute; and since the Indians are the owners of it in fee, they are entitled to just compensation as for a taking under the power of eminent domain.

*Judgment reversed*