### EMERY BIRD THAYER DRY GOODS CO. et al. v. WILLIAMS et al.
#### No. 2720.

District Court, W. D. Missouri, W. D.

Sept. 19, 1936.

Cooper, Neel, Kemp & Sutherland, of Kansas City, Mo., and Frank E. Atwood, of Jefferson City, Mo., for plaintiffs.

Channing, Corneau & Frothingham, of Boston, Mass., and McCune, Caldwell & Downing, of Kansas City, Mo., for defendants.

OTIS, District Judge.

Defendants are and for some time have been the owners in fee of certain real estate in Kansas City, Mo. By an indenture dated April 11, 1890, they leased this property for a term of 99 years to plaintiff's predecessor as lessee. Plaintiff realty company now is lessee and plaintiff dry goods company, which operates a large mercantile establishment on the premises, is sublessee. The yearly rental fixed in the lease for the 92 years following April 1, 1897, is 557,280 grains of pure unalloyed gold, payable in quarter-yearly installments of 139,320 grains. The lessors were privileged to require in lieu of a quarterly delivery of pure gold a quarterly payment of $6,000 in such lawful currency as they might designate. The full text of the rental clause is set out in the margin.[1]

Until December 19, 1933, the lessee paid the rent fixed in the lease by checks or drafts delivered quarterly, each for $6,000, payable in lawful money of the United States. They were accepted by defendants without protest. But on December 19, 1933, defendants demanded that thereafter, beginning with the quarterly payment due January 1, 1934, the lessee pay in gold. As to the payment due January 1, 1934, the lessee was given the option of paying, in lieu of 139,320 grains of pure gold, a number of dollars equal to the amount which the government would then pay for newly mined gold of the stipulated quantity (being $10,158.75).

The payments due January 1, 1934, April 1, 1934, July 1, 1934, October 1, 1934, and January 1, 1935, were made by checks or drafts, each for $10,158.75. In each instance of payment the excess above $6,000 (being $4,158.75) was paid under protest. Including the payment of January 1, 1935, the total of excess payments, as claimed by plaintiffs, is $20,793.75. On February

---

[1] "Said lessee covenants and agrees to deliver to the lessors, as yearly rental for said demised premises, at such office of the lessors, or their agent, or at such bank, in said City of Kansas City, or in the City of New York, or in the City of Boston, as the lessors may, from time to time, designate, Thirty-three Thousand Dollars ($33,000) in gold coin of the United States of the present standard of weight and fineness, in four quarterly yearly instalments, each in advance, of Eight Thousand Two Hundred and Fifty Dollars ($8,250) each, on the first days of April, July, October and January, in each and every year during the first four years of this lease, the first delivery to be made on the first day of April, 1890; Eighty Thousand Dollars ($80,000) in such gold coin in four instalments as follows, namely: Fifty-seven Thousand Five Hundred Dollars ($57,500) on the first day of April, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the first day of July, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the first day of October, 1894, and Seven Thousand Five Hundred Dollars ($7,500) on the first day of January, 1895, during the fifth year of this lease; Seventy-seven Thousand Dollars ($77,000) in such gold coin in four instalments as follows, namely: Fifty-six Thousand Seven Hundred and Fifty Dollars ($56,750) on the first day of April, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of July, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of October, 1895, Six Thousand Seven Hundred en Fifty Dollars ($6,750) on the first day of January, 1896, during the sixth year of this lease; Seventy-four Thousand Dollars ($74,000) in such gold coin, in four instalments as follows, namely: Fifty-six Thousand Dollars ($56,000) on the first day of April, 1896, Six Thousand Dollars ($6,000) on the first day of July, 1896, Six Thousand Dollars ($6,000) on the first day of October, 1896, and Six Thousand Dollars ($6,000) on the first day of January, 1897, during the seventh year of this lease; and Five Hundred and Fifty-seven Thousand, Two Hundred and Eighty (557,280) grains of pure, unalloyed gold, in four quarter-yearly instalments, each in advance, of One Hundred and Thirty-nine Thousand, Three Hundred and Twenty (139,320) grains each, on the first days of April, July, October and January, in each and every year, during the remaining ninety-two (92) years of said period of ninety-nine (99) years, the first delivery of such pure gold to be made on the first day of April, 1897.

"Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment, at the time and place appointed for such delivery, of the sum of Six Thousand Dollars ($6,000) in such lawful currency of the country as the lessors may designate."

20, 1935, plaintiffs demanded that defendants refund to plaintiffs the alleged excess payments totaling $20,793.75. This demand was refused. Contemporaneously (March 16, 1935) with the refusal of plaintiffs' demand defendants notified plaintiffs that the rent must be paid in gold (the privilege of delivering gold bullion in London was given) or possession of the leased premises surrendered. Thereupon the present proceeding was instituted.

The relief prayed in the bill is: (1) That the provision of the lease requiring the delivery of grains of gold as rental be decreed unlawful and void; (2) that the demand of defendants for delivery of gold bullion in payment of rental be decreed unwarranted and unlawful; (3) that the alternative demand of defendants for an amount of lawful money of the United States in payment of the quarter-yearly rental greater than $6,000 be decreed unwarranted and unlawful; (4) that the defendants be enjoined perpetually from attempting to collect as rental more than $6,000 quarter-yearly or from attempting to forfeit the lease for failure of plaintiffs to pay more than that amount.

The theories of the bill (for it embodies two somewhat inconsistent theories rather than one single theory) are: 1. The gold clause in the lease is void and unenforceable by reason of the Joint Resolution of Congress of June 5, 1933 (the full text of which is set out in the margin[2]), declaring certain gold clauses in certain contracts to be against public policy and that obligations affected by such gold clauses should be discharged upon payment, dollar for dollar, in any lawful currency of the United States. 2. The gold clause in the lease, calling for rental payments in

[2] "To assure uniform value to the coins and currencies of the United States.

"Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve Banks and national banking associations.

"Sec. 2. The last sentence of paragraph (1) of subsection (b) of section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes,' approved May 12, 1933, is amended to read as follows:

"All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations), heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.

"Approved, June 5, 1933, 4:40 p. m." 48 Stat. 112 (31 U.S.C.A. §§ 462, 463).

gold bullion, has been so modified by the conduct of the parties under the lease as that it has been either entirely abrogated with a substitution of an agreement to pay $6,000 in lawful currency quarter-yearly or has been modified to call for quarterly rental payments of $6,000 in lawful currency.

### No Waiver.

1. Little need be said touching the second of the two theories mentioned. It may be brushed aside in two short sentences. The fact that the lessors accepted payments of rent in currency (that is, by checks payable in currency) so long as that currency was convertible at will into the precise quantity of gold called for by the lease gives no support whatever to the contention that thereby the lessors indicated an intention to waive their right to demand gold in the stipulated quantity when currency in the amount theretofore accepted no longer was convertible into that quantity of gold or its equivalent in value. The lessors did not waive a right to demand gold by accepting gold (i. e., by accepting currency redeemable in gold).

### Applicability of Resolution.

2. Almost at once then we come to the question whether the Resolution of June 5, 1933, applies to the gold clause in this lease, and, if so, with what effect. So far as we are now concerned with it the Resolution is as follows: "Every obligation, heretofore * * * incurred, * * * shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. * * * (b) As used in this resolution [section], the term 'obligation' means an obligation * * * payable in money of the United States." Section 1 (31 U.S.C.A. § 463). The Resolution applies to and affects only those obligations which are payable in money of the United States. Even if that were not the express language of the Resolution, the necessary implication from other language in the Resolution, as "Every obligation * * * shall be discharged upon payment, dollar for dollar," etc., is that it applies to and affects only obligations which are payable in money of the United States. Only such an obligation can be discharged "dollar for dollar." An obligation payable in fence posts or bushels of wheat or grains of gold is not payable in dollars so as to be included in the language "discharged upon payment, dollar for dollar." Since the obligation set out in this lease is payable in "pure, unalloyed gold" (not gold coin, but gold bullion), it is not one of the obligations referred to in the Resolution and is not affected by it.

The conclusion stated would be indubitable if it were not for the proviso following the language in the lease fixing each quarter-yearly rental payment at 139,320 grains of. pure unalloyed gold: "Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment at the time and place appointed for such delivery, of the sum of $6000 in such lawful currency of the country as the lessors may designate." In this proviso plaintiffs find support for the application here of what they say is a rule of law and which they state as follows: "When at the option of either obligor or obligee, a contract may be performed in one of two ways, and afterwards performance of one option becomes unlawful or impossible through no fault of the parties, then the contract is to be interpreted as though the forbidden alternative were never in it; and the parties are bound by the other." [3]

We must look into the books to ascertain whether any such rule obtains, although we begin the search confident that the search will fail. The obvious object of the parties in writing the gold clause into this lease was to insure the lessors a rental which should continue, during the term of the lease, of a value fixed when the lease was written, notwithstanding changes in the value of money brought about by law. There was certainly nothing unlawful in that object nor in the means by which the parties sought to attain it. The proviso meant no more than that the lessors might elect to take currency in the amount of $6,000 instead of 139,320 grains of gold, the parties intending that the lessors would so elect, for the greater convenience of both parties, so long as the gold standard was maintained and so long as $6,000 is exchangeable for the stipulated number of grains of gold.[4] There is no inconsistency

---

[3] The quotation is from the brief of amici curiæ and the principal argument in support of the suggested rule of law was by them. The argument, however, was adopted by plaintiffs.

[4] Learned counsel for defendants sug-

between the proviso and the rent fixing term of the lease. It was intended to make easier and more practical payment of the real rental agreed upon. It certainly was not intended that the proviso should be used to destroy that which it was intended only to aid.

It is inconceivable that a rule of law can be discovered the effect of which when applied to a contract is to give the contract a meaning diametrically opposed to that which was intended by the parties to the contract. Does any one suppose this contract ever would have been entered into if the lessee had insisted it should be worded thus: "The yearly rental is fixed at 557,280 grains of pure unalloyed gold, payable in quarter-yearly installments of 139,320 grains (it is understood that the purpose and object of this requirement are to protect lessors against the effect of depreciation in the value of money). Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment at the time and place appointed for such delivery, of the sum of $6,000 in such lawful currency of the country as the lessors may designate. (Provided further that if for any reason it shall be impossible for the lessee to deliver grains of gold then lessors must accept $6,000 in lawful currency, regardless of whether or to what extent it has been depreciated)."

Where are the opinions of the courts announcing any such rule as defendants assert? None is cited. An array of cases and authorities [5] indeed is cited supporting the proposition that "When, at the option of * * * (the) obligor, a contract may be performed in one of two ways, and afterwards performance of one option be-comes unlawful or impossible through no fault of the parties, then the contract is to be interpreted as though the forbidden alternative was never in it." And it is argued that "there can be no distinction in principle whether the option is in obligor or obligee." To us, however, the distinction in principle seems obvious. Consider two illustrative cases.

(1) A contracts with B to sell to B for $1,000 the wheat produced in 1936 on the west "eighty" of his farm or the corn produced on the east "eighty" as A may elect. Came the grasshoppers and destroyed the corn. It is A's duty to sell the wheat. That he shall do so in the event there is no corn is entirely consistent with and in accord with the intent of both A and B.

(2) A leases his farm to B. The rent for a second year is fixed in the contract at 1,000 bushels of wheat, payable in advance, provided, however, A, at his option may demand 2,000 bushels of oats instead of 1,000 bushels of wheat. When the time for rent payment comes B cannot deliver wheat (the government has requisitioned all wheat at the then market price of $1.50 a bushel). Must A accept 2,000 bushels of oats (now of one-half the value of 1,000 bushels of wheat)? To require him to do so is inconsistent with the intent of both A and B. That intent was that the option given A should be exercised only if by exercising it he should get the equivalent in value of 1,000 bushels of wheat.

It will be noted that the contract under consideration here does not provide that the rent shall be "a quarter annual payment of 139,320 grains of gold or $6,000 in currency, as lessors shall elect." The rent is fixed absolutely (and not in the alternative) at so many grains of gold. The contract does not provide for a choice by

gests as a second reason for the proviso that the parties intended by it to enable the lessors to demand currency instead of bullion in the event of an appreciation of the dollar. We doubt that. He who wrote this gold clause undoubtedly had knowledge of the past and perhaps also an almost uncanny foresight of the future, and, guided by them, he sought to avoid loss which his clients would suffer from devaluation. All this increases our respect for this unnamed Boston lawyer. We prefer to absolve him from the charge of his successor, that he intended to secure for lessors the identical unjust result he intended lessee should not have.

[5] The cases and authorities cited include Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294; Mill Dam Foundery Co. v. Hovey, 21 Pick. 417; State v. Worthington's Ex'rs, 7 Ohio 171, pt. 1; Jacquinet v. Boutron, 19 La.Ann. 30; Stevens v. Webb, 7 Car. and Payne, 60; Rosenthal v. Perkins, 123 Cal. 240, 55 P. 804; Board of Education v. Townsend, 63 Ohio 514, 59 N.E. 223, 52 L.R.A. 868; Welsh v. Welsh's Estate, 148 Minn. 235, 181 N.W. 356, 13 A.L.R. 267; Parsons on Contracts (9th Ed.) vol. 2, p. 809; Lawson on Contracts (2d Ed.) § 446; Williston on Contracts, vol. 3, § 9161.

the lessors between gold and currency so that in no event is this a contract which "at the option of \* \* \* (the) obligee \* \* \* may be performed in one of two ways" (quoting the asserted rule of law). This contract may be performed only in one way, i. e., by paying gold. The contract with the proviso, that the lessors "may \* \* \* require" $6,000 in currency in lieu of 139,320 grains of gold, does not present alternatives, with a right of election between them in lessors. It gives an additional and supplemental right to lessors which they may exercise or may refuse to exercise. (When the contract provides that lessors "may require \* \* \*" currency in lieu of gold it certainly, by necessary implication, provides that lessors may refuse to require currency in lieu of gold.)

The distinction just sought to be made may be illustrated. A contract whereby A agrees to sell and deliver goods to B in January, 1930, at either one of two ports, Boston or San Francisco, that B may select differs essentially from a contract whereby A agrees to sell and deliver goods to B in January, 1930, at the port of Boston, provided, however, that if B wishes he may require A to deliver the goods at the port of San Francisco. Now, if the port of Boston is closed by quarantine in January, 1930, it might be argued that under contract No. 1 B is under duty to receive the goods at San Francisco, but certainly not so under contract No. 2. Under that contract the possibility that delivery might be made at San Francisco expressly was made dependent not on the possibility or impossibility of delivery at Boston but on the affirmative requirement by B (with or without reason) that delivery be made at San Francisco. To compel B to accept delivery at San Francisco not only without such a requirement by him but against his expressed injunction would be to defy rather than to perform the contract.[6]

We conclude then that the Resolution of June 5, 1933, has no application to the contract here and does not affect it. The contract will not be performed by the quarterly payment to the lessors of $6,000 in currency.

Impossibility of Delivering Gold, its Effect.

3. There has been such legislation, and, pursuant to that legislation, such executive action as that it is now impossible for plaintiffs literally to comply with the terms of the lease. They cannot deliver quarter annually 139,320 grains of pure gold at any bank in Kansas City, or New York or Boston. There are two things they can do, neither a literal compliance with the terms

---

[6] Section 469 of the Restatement of the Law of Contracts is cited in support of the suggested rule. That section is: "Impossibility of performing one or more but less than all of a number of performances promised in the alternative in a contract discharges neither the duty of the promisor if by the terms of the contract he had the privilege of choice, nor the duty of the promisee if he had that privilege, but merely destroys or limits the possibility of choice; except where a contrary intention is manifested or the impossibility exists at the time of the formation of the contract and there is such a mistaken assumption of the existence of a fact as renders the contract voidable under the rule stated in Section 502." No fault can be found with this statement if due regard is given to the qualification set out in it, to wit, "except where a contrary intention is manifested." The intention of the parties in the gold clause of the contract here considered is obvious. And that intention is an avoidance of the effect of the devaluation of the dollar. An intention contrary to an intention that if it is impossible for lessees to deliver gold bullion the lessors will accept devalued dollars is manifest.

The following illustration of what is meant by section 469 is given in the Restatement of the Law of Contracts: "A agrees to sell and deliver goods to B in January, 1930, at either one of two ports that B may select. During the whole of that month one of the ports is closed by quarantine regulations. B is under a duty to receive the goods at the other port, unless the impossibility existed at the time when the contract was made and was unknown to the parties." Certainly, however, the same conclusion would not have been stated had the contract provided that A should deliver goods to B in January, 1930, at the port of Boston, provided, however, that if B wishes he may require A to deliver the goods at the port of San Francisco. This is not a provision for alternative performance at the option of B, in the same sense as in the stated illustration. The alternative to the delivery of goods at the port of Boston is the option of B to accept or to refuse to accept the goods at San Francisco. Now if the port of Boston is closed by quarantine, it is certainly inconsistent with the intention of the contract to compel B to receive the goods at San Francisco.

of the lease. They can deliver quarter annually 139,320 grains of pure gold to the lessors in London, England. They can pay lessors quarter annually the present value in currency of 139,320 grains of newly mined gold. There is one other thing they can do (and that they agreed they would do if they did not pay the stipulated rent), they can surrender possession of the premises to the lessors, and, if possible, negotiate a new lease. Plaintiffs contemplate the first and second of these alternatives with distress and are aghast with horror as they view the third. Oh, for a pilot who will safely steer their craft between Scylla and Charybdis, the Scylla of paying the rent they agreed to pay, the Charybdis of surrendering the premises if they do not pay that rent!

Is there not a way through the narrow strait? Plaintiffs say that: Defendants ask forfeiture of the lease; equity will relieve against forfeiture when compensation can be made; in this case exact compensation can be made; $6,000 in currency is exact compensation for failure to deliver 139,320 grains of gold. We consider then these propositions.

■ Defendants do by their cross-bill ask now "that the court declare that the lease and all the rights of plaintiffs thereunder have ceased and determined" and "that the court order and direct the plaintiffs and each of them to immediately surrender the possession of the premises to the defendants." They do ask a forfeiture of the lease for noncompliance with its terms, but they did not so ask a forfeiture until plaintiffs, refusing to pay the money equivalent of the stipulated quantity of gold and thereafter refusing to deliver in London the stipulated quantity of gold, instituted this suit. Equity will relieve against a forfeiture of a lease for failure to pay the stipulated rent when due when compensation for that failure can be and has been made or is offered to be made. But is it possible to make compensation by a money payment for a failure to deliver a given quantity of gold, and, if that is possible, is a payment of $6,000 compensation for failure to deliver 139,320 grains of gold? These are questions to be considered.

### Obligation is to Deliver Value.

■ We will not discuss the question whether defendants desired gold as such when the gold clause was written in this lease or whether what they did desire was a rental compensation for their property which should not fluctuate with every possible depreciation in the value of the dollar. That the latter was the end aimed at and that the gold clause was but the means devised to attain that end are obvious. Gold and money are not identical, but for 6,000 years they have been intimately associated terms. For 6,000 years gold has been regarded as a symbol of value rather than as a commodity useful in the arts. That the intent of the parties in the gold clause of this lease was to secure value to the lessors is not an interpretation arrived at by construction, it is the patent meaning of the language used. If that is true the payment by plaintiffs to defendants of that number of dollars which is identical in value with the stipulated quantity of gold not only compensates for failure to deliver gold, but, in a true sense, exactly complies with the real requirement of the lease.

The contention of defendants at this point and in this regard just a little shocks the conscience. Whose conscience would not be greatly shocked if A, having leased a tract of land to B for 50 years at an annual rental of 5,000 grains of gold, should demand the gold, "the very grains of gold," after the sovereign has made it an offense for B to have or deliver gold, if B is willing and offers to give A the exact equivalent of the gold, the very equivalent for which A intends to exchange the gold should B deliver it? If it has so happened, as well it might have happened, that B has erected on the tract in question a building costing a million dollars or if, for some other reason, the tract has become five times as valuable as it was when the lease was executed, A's unconscionable demand better can be understood. It cannot be condoned. The defendants, of course, are not in the same position as the hypothetical "A," for the defendants were willing to take the equivalent of the gold named in the bond until the plaintiffs sought an unconscionable advantage in seeking to compel defendants to take much less than the equivalent of the stipulated quantity of gold.

It seems to us then that the rent provision in the lease substantially, if not exactly, is complied with when the money equivalent of 139,320 grains of gold is tendered.

### The Equivalent of Bullion.

■ 4. It is argued by plaintiffs that where it is impossible by reason of governmental prohibition to deliver gold bullion in a specified amount there is exact com-

pensation for that failure in the payment of that amount of currency which the government would pay for the specified amount of bullion, and, they say, if the defendants had in their possession 139,320 grains of gold they must turn it over to the treasury for $6,000. Hence, they say, the exact equivalent of 139,320 grains of gold is $6,000. Defendants deny that the statutes and regulations would require the lawful possessor of 139,320 grains of gold bullion to turn it into the treasury for $6,000. They assert it would be paid for at the price fixed for gold newly mined. We consider it unnecessary, however, to resolve this controversy.

Any statute or regulation which purports to compel the lawful possessor of gold bullion (or any other property) to surrender it to the sovereign for anything less than "just compensation" is clearly void and without effect.[7] A's obligation to deliver a stipulated quantity of gold to B certainly is not satisfied by the delivery of one-half that quantity merely because, if the whole quantity were delivered, the sovereign, without right, would seize half of it. We do not suppose that in days of old a debt to a tenant of 50 golden guineas would have been discharged by a payment of 25 because, if 50 were paid, the lord of the manor would have exacted 25. We do not suppose that if a Missouri farmer is bound by his contract to deliver a horse to his neighbor he can fulfill his obligation by delivering a horseshoe on the theory that if he did deliver a horse Robin Hood would steal it, leaving a horseshoe as a souvenir. Compensation by one party to another party for failure to deliver a given quantity of gold agreed to be delivered in a contract between the parties certainly is to be measured by the true value of the gold and not by a fictitious, artificial value. Especially is that true when the clear intent of the parties was to secure that true value and to guard against the discharge of the obligation by delivery of a fictitious, artificial value.

Plaintiffs bottom their argument on what was said in Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335. There, in an action against the United States for breach of its contract to pay $10,000 "in United States gold coin of the present [1918] standard of value" the Supreme Court said the plaintiff "can recover no more than the loss he has suffered." The court said: "In the domestic transactions to which the plaintiff was limited, in the absence of special license, determination of the value of the gold coin would necessarily have regard to its use as legal tender and as a medium of exchange." We understand the court meant that since gold coin must be converted into currency, dollar for dollar, perforce a lawful exercise of governmental power (for gold coins "bear * * * the impress of sovereign power which fixes value and authorizes their use and exchange"), no damage is sustained if currency is paid, dollar for dollar, for gold coin promised.

The case concerned a contract to pay gold coin. Gold coin never was usable except as money, and then (when Perry v. United States was decided) could be used only for conversion into lawful currency. The decision does not purport to apply to a contract for the payment of gold bullion. The reasoning of the opinion does not apply to such a contract. "The restraint thus imposed upon holders of gold coin was incident to the limitations which inhered in their ownership of that coin." There are no limitations which inhere in the ownership of gold bullion that do not inhere in the ownership of all property. Any property may be taken by the sovereign for a public use, but only upon just compensation. What is just compensation is not determinable by governmental fiat. So we say again, if it be assumed that the defendants here lawfully are in possession of 139,320 grains of gold bullion and if it be assumed that Congress has passed a statute (or has authorized the President to make an order) that the defendants shall sur-

---

[7] This is not to say, of course, that the Congress has not the constitutional power to require all gold to be turned over to the government. It has that power. The Congress has the power to make possession of gold, after a fixed future date, an offense. It has the power to impose a penalty for that offense. By way of penalty it may compel the surrender of gold, unlawfully held, for less than its true value. What the government would pay for gold unlawfully possessed, after deducting a penalty, certainly would not measure the value of gold lawfully held. The assumption here must be that lawfully there has been delivered to the lessors and that lawfully they have the stipulated quantity of gold, for the argument is that if it were possible (that is lawfully possible) to comply with the contract and deliver gold it would be worth only what the government would pay for it.

render that gold for $6,000 or $2,000 or $5, that statute is void utterly. The equivalent in currency of a gold double eagle well may be that amount of currency which the government decrees it must be exchanged for, for the double eagle "bears the impress of the sovereign power" to compel that exchange. But the equivalent in currency of a thousand grains of gold (or a thousand bushels of corn), if the government seizes them, is their true value. That value certainly will not be determined by what would be both an artificial and a lawless standard, a standard which gives one value to gold newly mined and but little more than half that value to the same gold a day later in another's hands.

### Conclusion.

5. Perhaps it was unnecessary to have written so much concerning this simple case. It is a simple case. One man owned a piece of ground in Kansas City. Another man, a merchant, desired to use that ground and the building on it for business purposes. A contract was entered into. It was a simple contract, easily understood. Neither party was compelled to enter into that contract against his will.

The parties to the contract agreed that the rent should be a stipulated number of grains of gold a year. About such an agreement there was nothing either illegal or in any sense unethical. In effect, the owner said to the merchant who wished to rent: "I will lease my ground to you, not for dollars, but for grains of gold. I want grains of gold, not dollars, because next year or at sometime during the life of this lease the government may devalue dollars. It cannot devalue grains of gold." In reply, the merchant said, in effect: "I understand and I agree and I will pay you grains of gold, not devalued dollars. And if I do not pay you grains of gold or their equivalent in value, then ground and building go back to you."

Exactly that has happened which it was foreseen might happen. The dollar has been devalued. Shall not the merchant perform his contract? He agreed that he would pay grains of gold or their value and that if he did not or could not he would return the rented property. Should he not do one or the other of those two things? Shall some judge say: "The parties to this simple contract meant just the opposite of what everyone knows they did mean?" Shall some judge say: "You made the contract you wished to make, but, against your will, I shall make a new contract for you by which you will be bound for half a century to come." No judge has such arbitrary power. Neither the President nor the Congress has such power. Neither the President nor the Congress ever has attempted to exercise such power as to any contract of the character of this one.

### Findings of Fact.

The court finds the facts to be as stipulated by the parties and will consider such additional suggested findings as may be submitted within ten days.

### Conclusions of Law.

1. The Resolution of June 5, 1933, has no application to the contract here. 2. When, by operation of law, it became impossible for plaintiffs to deliver the quantity of gold stipulated in the contract it became their duty under the contract to deliver lawful currency of the United States in an amount equivalent in value to the specified quantity of gold. 3. The equivalent in value of 139,320 grains of gold is now (and since the institution of this suit has been) $10,158.75 in lawful currency of the United States. 4. Defendants are entitled either to be paid $10,158.75 quarter annually (and hereafter a different amount, if the value of the dollar shall be further changed) or to retake possession of the leased property.

To each of these conclusions of law plaintiffs and defendants are allowed exceptions.

### Indicated Decree.

Counsel for defendants will prepare and submit a form of decree, consistent with and effectuating the stated conclusions of law and assessing costs against the plaintiffs.