CROWLEY, Alien Property Custodian, v.
COMMODITY EXCHANGE, Inc., et al.
No. 167.

Circuit Court of Appeals, Second Circuit.
March 1, 1944.

Lemuel Skidmore, Sp. Asst. to Atty. Gen. (James B. M. McNally, U. S. Atty., of New York City, George A. McNulty, Chief, Alien Property Unit, War Division, Department of Justice, and A. Matt Werner, Gen. Counsel to Alien Property Custodian, both of Washington, D. C., on the brief), for plaintiff-appellant.

Donald Marks, of New York City (Baer & Marks and Julius B. Baer, all of New York City, on the brief), for defendants-appellees.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This action was commenced on October 20, 1941, by Mitsui & Co., Ltd., a Japanese corporation, to enjoin the Commodity Exchange, Inc., and the Commodity Exchange Silk Clearing Association, Inc., from carrying out an alleged resolution of the Board of Governors of the Exchange of October 15, 1941, directing the liquidation and settlement of all outstanding raw silk contracts made on the Exchange at prices ranging from $3.55 to $3.65 per pound, and also to recover $150,949.50 paid to the Clearing Association by five brokers for the account of plaintiff as variation margins on 180 of plaintiff's raw silk future sales contracts. Upon the outbreak of the war with Japan, Mitsui became an alien enemy; and by an order issued August 17, 1942, title to its property and assets in the United States were vested in the Alien Property Custodian, who was thereupon substituted as plaintiff in this suit. After a trial the District Court dismissed the complaint and vacated the injunction which had been issued pending the action by consent. From this judgment plaintiff has appealed.

The defendant Exchange is a New York membership corporation which, prior to July 28, 1941, furnished facilities for trading in various commodities, including raw silk. The defendant Clearing Association is a New York stock corporation, the stock in which is owned by approximately thirty-six of its members, also members of the Exchange, who are known as "clearing members." In order to place contracts for the purchase and sale of raw silk futures on the Exchange it is necessary to act through the Clearing Association. Mitsui & Co., although a large dealer in raw silk futures, was neither a member of the Exchange nor a clearing member, possessing only what were known as revocable "corporation privileges," which granted the right to transact business at member rates of commission. All of its contracts were hence carried through five clearing members.

On July 25, 1941, when Mitsui was short 418 raw silk contracts on the Exchange, having sold for delivery in various future months a total of 4,180 bales of raw silk, the Office of Production Management in Washington issued General Preference Order M-22 to the effect that no person should thereafter deliver or accept delivery of raw silk unless authorized by the Director of Priorities. The following day, a Saturday, when the silk market was closed, the Exchange received a request from the Price Administrator in Washington to suspend all trading in silk. On Monday morning, July 28, therefore, the Board of Governors voted by unanimous vote of the seventeen members present to suspend trading in raw silk futures and deliveries pursuant thereto. Later the same week, on August 2, the Office of Price Administration and Civilian Supply issued Price Schedule 14 fixing the ceiling price for raw silk at $3.08 per pound, a considerable drop from the last trading price on the Exchange, which on July 25 had ranged from $3.55 to $3.65, depending on the delivery month. On August 11, the Governors of the Exchange met again and by a vote of nineteen to none adopted a resolution providing for the liquidation of all open silk contracts and authorizing the President, pursuant to § 409 of the By-Laws, to appoint a special committee to investigate the open position and to hold hearings, to which interested members should be invited, in order that the manners and terms upon which such open contracts should be liquidated might be determined by the Board. After hearings upon notice to all members and investigation, this committee reported back that the liquidation should be on the basis of the closing prices of July 25.

The Board of Governors, with twenty of the twenty-eight members present, met on October 15, 1941, to consider the committee's report. It was decided, by a vote of thirteen to four, that the liquidation of the raw silk contracts should be carried out through the fixing of a settlement price and, by a vote of sixteen to none, that the settlement date should be October 22, 1941. An amendment to the resolution for approval of the report was proposed that the price should be pegged at $3.08 per pound, the OPA price ceiling; but this amendment was defeated, seven to ten, and instead, the resolution approving the committee's recommendation was adopted by a vote of nine to seven, four members registering themselves as not voting. After this vote one member from the minority requested that the Board interpret § 409 of the By-Laws to determine whether the resolution required a majority or a two-thirds vote, whereupon another minority member moved that it was the interpreta-

tion of the Board that only a majority was necessary to put into effect the recommendations of a committee appointed under § 409. The chair, after consulting counsel, ruled the motion out of order. Then, immediately and apparently without further discussion, the meeting unanimously adopted a resolution that upon the settlement and liquidation of outstanding contracts for silk the prescribed commissions for buying and selling should be charged.

These actions of the Board of Governors were damaging to Mitsui & Co., because its short contracts, originally purchased at prices which the court found averaged $2.88 per pound, were liquidated at prices between $3.55 and $3.65 per pound, and it was also left with physical raw silk which could only be sold to the Government at the ceiling price of $3.08. By stipulation made after the action was brought and approved by the court, Mitsui was permitted to liquidate by private settlement such of these contracts as it could; and it did make such settlements, obtaining the release of the margins previously put up, for all but 180 of its contracts.[1] It is these contracts and the protecting margins which are now the subject of the claims of law made in its behalf. The claims are that the Board had no authority under the By-Laws of the Exchange to suspend trading and other liquidation; that the resolution of October 15, 1941, setting the liquidation price was not accepted by the number of votes required by New York law and § 409 of the By-Laws; that the performance of plaintiff's outstanding contracts was rendered illegal by General Order M-22, thereby rendering them invalid and unenforceable from their inception; and that such liquidation proceedings would, if carried out, violate the National Defense Act and Regulation No. 1 of the Office of Production Management. The first two of these four objections to the action of the Exchange comprise the real crux of the case.

█ The action of the Board of Governors regarding silk futures can be roughly divided into two steps. Trading in silk on the Exchange was first suspended, under the general authority of the Board, at the meeting of July 28; the liquidation procedure was then established at the meetings of August 11 and October 15, pursuant to the powers granted in § 409 of the By-Laws. There is no doubt of the general power of the Board of Governors of the Exchange to compel members and their customers to cease trading and accept a reasonable settlement of their contracts. In Thomson v. Thomson, 315 Ill. 521, 146 N.E. 451, the Illinois Supreme Court held that a rule of the Chicago Board of Trade conferring upon its Board of Directors the power to regulate "the use of the Exchange rooms" was sufficient authority for the Board to suspend trading in corn futures after the entry of the United States into World War I and order the settlement of all open contracts at a reasonable price. This doctrine was expressly affirmed in Garcia Sugars Corp. v. New York Coffee & Sugar Exchange, Inc., Sup., 7 N.Y.S. 2d 532, affirmed w. o. op. sub nom. Rifkind v. New York Coffee & Sugar Exchange, Inc., 258 App.Div. 871, 16 N.Y.S.2d 1023, regarding a suspension of sugar trading due to the operation of the Jones-Costigan Quota Law. In the present case, § 103 of the By-Laws grants to the Board of Governors control over the Exchange rooms and power to "adopt such rules and regulations as it may deem advisable for carrying out the objects of the Exchange"; and § 408 gives the Board power with or without notice to close the Exchange for trading or all business or to suspend trading, "as may, in its judgment, serve to promote the best interests of the Exchange or of the public." Hence the resolution of July 28 ordering the suspension of trading was undoubtedly valid.

█ Under the authorities cited, the general corporate authority of the Governors would also sanction the liquidation procedure; but since § 409 of the By-Laws deals specifically with the matter of liquidation, it must be considered a limitation upon the terms of any general law. Each corporation certainly has the power to delimit by provision in the by-laws the power of its board of governors, and it is § 409 which the Board purported to follow in settling the details of liquidation. Hence we test the validity of the resolutions passed at the August 11 and October 15 meetings of the Board in the light of

---

[1] It appeared at the trial that Mitsui had filed a claim with the War Production Board for just compensation based upon the prices at which it had been or would be compelled to settle its contract, and that no hearing had as yet been held upon the claim.

its provisions. It first provides, "Whenever it shall appear" that a situation exists which "may endanger the normal functioning of the Exchange or of the market, or that conditions have arisen that jeopardize the maintenance of a free, open and orderly market, or that jeopardize the fulfillment of outstanding contracts, or that threaten to conflict with the best interests of the Exchange or of the public," the Board of Governors, "by a vote of two-thirds of those present and voting, but in no event by less than twelve affirmative votes, may itself, or through any regular or special committee appointed by the Board, investigate the situation." A separate sentence goes on to state that if the Board decides that such a situation exists, or that the best interests of the Exchange or of the public may be threatened, the Board shall have the power, after affording reasonable opportunity for hearing, to take steps to regulate or correct the conditions and for that purpose might require members "to liquidate in whole, or in part, their position or positions within such time and upon such terms as may be fixed by the Board, or to take such other steps as may be deemed necessary or desirable in the discretion of the Board."[2] The section thus does not deny the liquidation power of the Board, but merely prescribes certain procedures which must be followed and certain conditions which must exist as a prerequisite to the existence of the power.[3]

Plaintiff's position that the situation created by the events commencing July 25 and 26 did not warrant action under § 409 cannot be sustained. General Preference Order M-22 and the communications from the Price Administrator surely brought about conditions that endangered the normal functioning of the market, that jeopardized "the maintenance of a free, open and orderly market," and that threatened "to conflict with the best interests * * * of the public." Plaintiff's objections are hence reduced to questions concerning the propriety of the procedure followed by the Board. In this respect, there can be no fault found with the appointment at the August 11 meeting of the investigatory committee, for nineteen members were present, seven more than the minimum established by § 409, and the vote was unanimous. Nor can the procedure leading to the committee's report be questioned, for the committee appears to have acted with great care, after due notice to the members, a hearing at which seventy-eight members were present, with discussion unusually free and vigorous, and extensive canvassing of the problem with Washington authorities and others. Nor does plaintiff contest the first, second, and fourth resolutions adopted on October 15. This, indeed, could not very well be done, for all measured up even to the standard of a two-thirds vote. The first, which provided that liquidation should be carried out by means of the fixation of a settlement price, was carried by a vote of thirteen to four; the second, setting the settlement date, went through sixteen to none; while the fourth, which dealt with the payment of commissions, was passed by unanimous vote of the twenty members present.

The essential controversy centers about the validity of the third resolution of October 15, that which accepted the suggestion of the investigatory committee and pegged the settlement price as of the closing prices of July 25. As the minutes show most clearly, indeed as the course of events had made well-nigh inevitable (as we shall point out below), the only point of dispute at that time in the whole liquidation process was not whether liquidation should be ordered, but as to which of the two prices in dispute should be made the settlement

---

[2] The section also provided that failure of a member to comply promptly with the requirements prescribed by the Board would subject him to "censure, fine, suspension or expulsion" under § 210 of the By-Laws. By the latter section the Board, by the affirmative vote of two-thirds of those present, and in no event less than twelve, may suspend, fine, or censure a member, and by the affirmative vote of three-fourths of those present, and in no event less than fifteen, may expel a member.

[3] Other by-laws also grant extensive powers to the Board. In addition to §§ 103 and 408, referred to above, § 404, said to be aimed at "corners" of the market, gives the Board discretion to afford relief as "the emergency may demand" whenever "through any exceptional contingency" deliveries are not possible, and "an extraordinary situation arises wherein a rigid enforcement of contracts generally would be grossly at variance with just and equitable principles of trade or the public interest," while § 137 gives the Board "emergency relief powers" as to "means and methods of payment" when "the ordinary media of exchange and payment are not available."

price. Plaintiff alleges that the vote was insufficient not only under the terms of § 409, but also under New York General Corporation Law, Consol.Laws, c. 23. If the requirement for a two-thirds majority and a minimum of twelve votes contained in the first sentence of § 409 applies also to this resolution under the second sentence, the resolution must be deemed invalid. It is the opinion of this court, however, that these provisions do not apply to actions by the Board under the second sentence of the section.

There is no inherent reason why the two sentences of § 409 must be read together as requiring the same vote. (A third and final sentence prescribing penalties pursuant to § 210 necessarily requires a different vote.[4]) The natural reading is otherwise; indeed, the form and sequence of statement is such as to limit the vote requirement to the provision for initiation of investigation and render awkward a reading which would also apply it to the later grant of power to require correctional steps from the member or members involved. Further, the two steps involve quite different considerations. The first, even if it only takes the form of appointing a committee, is the exercise of a judgment that the normal functioning of the Exchange is at least endangered and, in view of the delicate balancing of interests and expectations involved in any exchange trading, is, of course, infinitely more serious than the ordinary appointment of an investigating committee by a corporation or club. While it is true that the Board has emergency powers under § 408 to suspend trading without this vote, this section in effect requires a more solemn decision that emergency corrective measures are required. Once that decision has been made, however, and the members afforded an opportunity to be heard, as they were here by committee, the final vote as to just what the correctional measures should be should not be rendered difficult, if not impossible, by a

requirement hard to meet in the light of the naturally opposing interests of the members. The By-Laws appear to have been most carefully drawn to state explicit requirements for voting wherever they were deemed necessary.[5] We cannot regard the omission to make this final step subject in terms to the voting requirement stated for the initial step as other than deliberately intended.

The present case illustrates the stultifying effect which would follow from the interpretation of § 409 pressed by plaintiff. It was but natural that the shorts would press for settlement at the figure finally reached (by government compulsion, it is true) as the price of raw silk when liquidation was being debated; but it was logical for the longs to press for the figures reached on the last occasion of free trading and found by the District Court on appropriate evidence to represent fair market value at that time.[6] Certain arguments of convenience also supported this result; for the traders, as required by the trading rules, had supplied margins where necessary to cover the "variations" from their previous positions, and these had been settled and paid over to the persons as indicated by the rules a few days after the suspension of trading. In other words, this form of settlement in substance authenticated what had been done. But the important point is that no one wanted a stalemate, which is what plaintiff seems to be pressing for on the surface. Thus it is highly significant that minority members wished to interpret the section as requiring only a majority vote; and the entire board did actually so interpret it by its later vote for the charging of the prescribed commissions on the settlement and liquidation of the silk contracts which was the subject matter of the controverted resolution. Since § 103 gives the Board final and exclusive power to interpret the By-Laws, this action of the Board would be sufficient to justify the vote. As a matter of fact,

---

4 See note 2, supra.

5 Sec. 101 states that eleven members of the Board shall constitute a quorum. Special requirements are found in §§ 137 (Emergency Relief Powers, note 3, supra), 139 (Amendments to By-Laws and Rules— four provisions), 206 (Election to Membership), 210 (Suspension and Expulsion— two provisions, note 2, supra), 216 (Reinstatement of Suspended Member), 229 (Reinstatement of Failed Member), etc.

6 This divergence of view had developed earlier when the shorts generally desired to liquidate their contracts by delivery of negotiable documents of title, the OPM having ruled that only delivery of the silk itself was prohibited, while the longs took the position that transfer of title without possession did not fulfill the contracts. This point became academic by the time of the crucial vote, since the OPM had then prohibited even transfer of title.

since the effect of the injunction herein granted was to suspend liquidation of contracts, plaintiff appears in substance to have been pressing for a reversal of the vote; for it was obvious that if plaintiff succeeded in his action, the Board would have to meet again to determine how the emergency situation with which it was faced in 1941 was to be liquidated by its members and their customers. Except for the delay caused by the litigation, it would seem that plaintiff would gain nothing unless the contention of the shorts eventually prevailed.

It is true that plaintiff's position that performance of the contracts was excused because they were rendered unenforceable by act of government would suggest another conclusion, namely, that all contracts be treated as though cancelled. When this was suggested at the committee's open hearing, it was termed ridiculous, and not thereafter mentioned; and defendants argue that it is impossible, for the contracting parties cannot be identified so that they can be put in statu quo. This is because less than five per cent of raw silk futures contracts are consummated by delivery. The remainder are liquidated before maturity. This is accomplished by executing an opposite contract in the same delivery month, so that the two contracts offset each other when cleared through the Clearing House. And since the Clearing House carries only the clearing members' net excess of long or short contracts in each delivery month, it is not feasible to disentangle the transactions. In effect, the course of trading so far executes the contracts that simple cancellation is impossible, and the arbitrary results which would flow from attempting to excuse only identified obligors from performance were such that this did not appear as a real alternative in the voting.

Hence we think the District Court was correct in its interpretation of § 409. The fact that Mitsui was an outsider and not a member of the Exchange does not alter the situation. In applying for corporate privileges Mitsui expressly contracted that it should be "subject to and shall abide by the By-Laws, rules, regulations and rulings" of the Exchange. Moreover, when it gave orders to its carrying member-brokers for the execution of contracts on the Exchange, it tacitly agreed to be bound by all of the rules, regulations, and customs of the market. Bibb v. Allen, 149 U.S. 481, 489, 13 S.Ct. 950, 37 L.Ed. 819. The decision in Jager v. Tolme & Runge and the London Produce Clearing House, Ltd., [1916] 1 K.B. 939, 951, strongly relied on by plaintiff, which holds that ambiguous language of a by-law is to be construed in favor of a nonmember, is hardly to the contrary. There involved was no such explicit procedure as we have here—only a vague provision that "should the state of war prevent shipment or warehousing and/or passing of documents," then any party was entitled "to appeal to the council for a decision which shall be binding on all concerned." Nor are we impressed by plaintiff's attempt to disqualify a number of those in the prevailing vote for interest in the result. Like Private Willis of Iolanthe, who found every boy and girl born into the world alive either "a little Liberal or else a little Conservative," Mitsui, when it undertook to do business through the Exchange, would expect to deal with those favoring either short or long interests, if not both. Moreover, the argument assumes that brokerage firms necessarily take the same views as their customers. In order that the Exchange might choose for its officers men who were qualified by knowledge and experience, it must necessarily take members active in trading. The long and careful consideration given the issues involved demonstrates that the members acted with as much circumspection as any interested party could realistically expect. Plaintiff's real difficulty is that the group presumably interested his way did not have the necessary votes.

Nor was the nine-to-seven vote insufficient under the New York General Corporation Law because it was not adopted by a majority of the twenty Governors present. The contention is not sound that § 27 of that law, which states, "Unless otherwise provided a majority of the board * * * shall be necessary to constitute a quorum for the transaction of business and the act of a majority of the directors present at such a meeting shall be the act of the board," required eleven affirmative votes in order to carry the resolution. Section 27 must be construed in connection with the next following section, 28, and the latter provides that action may be taken by the directors "acting by a majority of a quorum." Thus it appears to be the legislative intent that a board of directors can act by a majority of a quorum, irrespective of the number of other directors

who may merely be present at the meeting, for any other construction would result in the emasculation of § 28. This accords with the weight of authority. 2 Thompson on Corporations, 3d Ed., § 1256; 5 Fletcher, Cyclopedia Corporations, Perm.Ed., § 2020; Smith v. Proctor, 130 N.Y. 319, 322, 29 N.E. 312, 14 L.R.A. 403; In re Brearton, 44 Misc. 247, 89 N.Y.S. 893; Rushville Gas Co. v. City of Rushville, 121 Ind. 206, 23 N.E. 72, 6 L.R.A. 315, 16 Am.St.Rep. 388; State ex rel. Shinnich v. Green, 37 Ohio St. 227, 232. Furthermore, § 101 of the By-Laws here specifically states that eleven members shall constitute a quorum; and hence § 27 of the General Corporation Law is by its own terms ("Unless otherwise provided") made inapplicable. Hence § 28 must control.

Plaintiff's final allegations of error can be dismissed with but a few words. First, General Preference Order M-22 did not render performance of the futures contracts illegal so that they thereby became invalid and unenforceable from their inception. All that occurred was that performance by delivery was rendered illegal. While it is true that the By-Laws of the Exchange intended delivery under the contracts, one of the necessary terms of each contract was that it could be settled and liquidated by the Board of Governors in such contingencies as are contemplated by § 409. This follows from the provision which states, "This contract is made in view of, and in all respects subject to the By-Laws" of the Exchange. There hence were alternative methods of performance; and it is well settled that when a contract provides for one of two alternatives, impossibility of performance of one alternative does not excuse the promisor from performing the other. Yankton Sioux Tribe v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294; 6 Williston on Contracts, Rev.Ed. 1938, § 1961. Second, the liquidation of Mitsui's contracts with resultant loss was no violation of § 2(a) of the National Defense Act of June 28, 1940, as amended by Act May 31, 1941, 55 Stat. 236, 50 U.S.C.A.Appendix, § 1152(a), and of § 944.13 of Regulation No. 1 of the Office of Production Management, which provide that "no person, firm, or corporation shall be held liable for damages or penalties for any default under any contract" which shall result from compliance with the terms of the respective regulations. Mitsui was not in default, since the liquidation under §

409 if anything avoided default; and, in any event, its losses certainly cannot be called "damages or penalties" within the meaning of the above provision.

Our conclusion that the action taken by the Exchange was lawful as to plaintiff's predecessor in interest, Mitsui & Co., destroys the basis for the further claim made for return of the variation margins paid to the Clearing Association to settle its contracts.

Judgment affirmed.