898 F.Supp. 1453 (1995)
UNITED STATES of America, et al., Plaintiffs,
v.
STATE OF WASHINGTON, et al., Defendants.
No. CV 9213.
United States District Court, W.D. Washington.
August 28, 1995.
*1454 *1455 *1456 Peter C. Monson, U.S. Department of Justice, Denver, Colorado, for U.S.
Allan E. Olson, LaConner, Washington, for plaintiff Swinomish Indian Tribal Community.
Mason D. Morisset, Seattle, Washington, for plaintiff Tulalip Tribe.
Richard Davies, Quileute Natural Resources, LaPush, Washington, for plaintiff Quileute.
Nettie Alvarez, Richard Ralson, Seattle, Washington, for plaintiff Hoh.
Richard Reich, Taholah, Washington, for plaintiff Quinault Indian Nation.
Annette Klapstein, Tacoma, Washington, for plaintiff Puyallup Tribe.
Daniel A. Raas, Bellingham, Washington, for plaintiff Lummi Indian Tribe.
Robert L. Otsea, Auburn, Washington, for plaintiff Muckleshoot Indian Tribe.
John Arum, Richard Berley, Seattle, Washington, for plaintiff Makah Indian Tribe.
John Sledd, Suquamish, Washington, for plaintiff Suquamish Indian Tribe.
Philip A. Katzen, Allen H. Sanders, Debora G. Juarez, Seattle, Washington, for ten plaintiff Indian Tribes.
Kathryn Nelson, Eisenhower-Carlson, Tacoma, Washington, for plaintiffs Jamestown, Lower Elwha, Port Gamble Bands of S'Klallams, Skokomish.
Jeffrey Jon Bode', Bellingham, Washington, for plaintiff Nooksack Tribe.
Bill Tobin, Vashon, Washington, for plaintiff Nisqually Tribe.
Kevin R. Lyon, Olympia, Washington, for plaintiff Squaxin Island Tribe.
Harold Chesnin, Sharon Shaw, Brown-Matthews, Seattle, Washington, for plaintiff Upper Skagit Tribe.
Robert C. Hargreaves, Joseph S. Montecucco, Jay D. Geck, Robert Costello, Attorney General's Office, Olympia, Washington, for defendant State of Wash.
Eric Richter, Seattle, Washington, Malcolm L. Edwards, Edward-Sieh, Seattle, Washington, for intervening defendants Carter and Adkins, et al.
Albert Gidari, James Rasband, Perkins Coie, Seattle, Washington, for defendant Puget Sound Shellfish Growers.
James J. Johnson, Olympia, Washington, for defendant UPOW.
Daniel W. Wyckoff, Olympia, Washington, for Inner Sound Crab Association.

*1457 ORDER RE: IMPLEMENTATION OF SHELLFISH PROVISO
RAFEEDIE, District Judge, Sitting by Assignment.
The Court conducted an evidentiary hearing to assist it in implementing its December 20, 1994, Memorandum Decision and Order[1] interpreting the Shellfish Proviso of the Stevens Treaties; having read and considered all of the papers filed in this matter and argument of counsel, the Court HEREBY FINDS AND ORDERS as follows:

I. Introduction
The purpose of this Order is to provide a framework for the implementation of the Tribes' fishing rights under the Shellfish Proviso. It is clear that, under the Treaties as interpreted in the Boldt decision,[2] the Tribes have the absolute right to take fifty percent of the shellfish from natural beds in the Tribes' usual and accustomed grounds and stations. Although enforcing this right necessitates changes in the status quo on all the affected property, effectuating the Treaty shellfishing right presents a particularly difficult problem with respect to property owned or leased by commercial Shellfish Growers and Private Property Owners, as compared to that owned by the State of Washington.
The Shellfish Growers and Private Property Owners are, effectively, innocent purchasers who had no notice of the Tribes' Treaty fishing right when they acquired their property. Indeed, many of these Growers and Owners purchased their land at or before the turn of the century, and they reasonably believed the land to be free of encumbrances and servitudes. Their belief was reinforced by the Tribes' failure to formally assert the Treaty right until over 100 years after the Stevens Treaties were signed.[3] Consequently, it is incumbent upon this Court to use its equitable powers to effect a balance between the Tribes' Treaty shellfishing right and the Growers' and Owners' interest in the peaceful enjoyment and/or commercial development of their property.
There is ample authority for this Court to invoke its equitable powers in implementing a plan under which the Tribes may exercise their Treaty right. For example, in Yankton Sioux Tribe of Indians v. United States, although not explicitly acknowledging that it sought an equitable result, the United States Supreme Court approved the payment of money damages to the Yankton Sioux Indians in lieu of restoring a 648-acre tract to the tribe. 272 U.S. 351, 357, 47 S.Ct. 142, 143, 71 L.Ed. 294 (1926). The tract, which the Court held belonged to the Indians in fee, had been "opened to settlement and large portions of [it were then] in the possession of innumerable innocent purchasers." Id. As a result, the Court concluded, it would have been "impossible to ... restore the Indians to their former rights." Id. Clearly, however, it would have been literally possible to eject the settlers, although obviously the Court viewed that option as neither practical nor desirable, under the circumstances. Consequently, it appears that the Court engaged in a sub rosa balancing of hardships. More recently, in South Carolina v. Catawba Indian Tribe, Inc., Justice Blackmun acknowledged that equitable considerations might have limited the remedies available had the plaintiff Tribe prevailed on its claim to 144,000 acres of land. 476 U.S. 498, 519 n. 5, 106 S.Ct. 2039, 2050 n. 5, 90 L.Ed.2d 490 (1986) (Blackmun, J., dissenting) (citing Yankton).[4]
Similarly, the Ninth Circuit has approved weighing equitable considerations in devising a remedy in an action to quiet title to a parcel of land in the daughters of a Nez Perce Indian. See Brooks v. Nez Perce County, Idaho, 670 F.2d 835 (9th Cir.1982). Noting that such considerations would not bar the claim to the land entirely, the Brooks court nonetheless concluded that "[l]ack of *1458 diligence by the government in exercising its role as trustee may be weighed by the district court in calculating damages" for several decades' loss of use of the land. Id. at 837.
In United States v. Imperial Irrigation District, 799 F.Supp. 1052 (S.D.Cal.1992), Chief Judge Keep relied on Brooks to award monetary damages to the plaintiff Indians, rather than restoring tribal land to them. The Indians had a fee interest in land that was flooded, by the United States, for the agricultural development of thousands of acres of land in Riverside and Imperial Counties. Judge Keep utilized equitable factors suggested by the Restatement of Torts to balance the hardships among the parties and concluded that a damage award was more appropriate than injunctive relief because "[a]n injunction would render useless thousands of acres of cultivated farmland to the detriment of innocent farmers who are blameless in this lawsuit and who have worked hard to cultivate desert lands." Id. at 1069.
Further support for the application of equitable principles in drafting an implementation order in this case is found in the Ninth Circuit's opinion affirming the Court's order in connection with the Tribes' anadromous fishing rights: "A cotenant dissatisfied with his partner's exploitation of their common property may seek a partition of the property in order to protect his interest in it. By analogy, the Indians are entitled to an equitable apportionment of the opportunity to fish in order to safeguard their federal treaty rights."[5]United States v. Washington, 520 F.2d 676, 687 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (emphasis added). It is the Court's view, therefore, that in the instant controversy, the Court has not only the authority, but the duty, to fashion an implementation plan in accordance with principles of equity.

II. Equitable Considerations
The Court is persuaded by Judge Keep's analogy to the tort of trespass, in Imperial Irrigation District, supra, and likewise applies in this case the factors suggested by the Restatement of Torts:[6]
First, the relevant interest to be protected is the Tribes' Treaty shellfishing right, which is similar to a profit à prendre or a license  not a fee interest in land. Hence, the powerful historical legal protection of land ownership is not implicated in this case. Nonetheless, because it derives from the Treaties, the Tribes' right is entitled to significant protection.[7]
Second, although from a purely economic standpoint, monetary relief might be virtually interchangeable with injunctive relief, the evidence clearly indicates that the Tribes' shellfishing rights are not purely economic. Rather, the Tribes have historically fished for religious and ceremonial  as well as subsistence  purposes; thus, their right is not adequately vindicated by monetary relief. Moreover, the Tribes argued persuasively that intangible benefits will inure to their members from exercising the right to fish, such as the cultural value of participating in a traditional activity and the self-esteem of being gainfully employed. These benefits *1459 would be lost were the Court to substitute monetary relief for the right to fish.
Third, as previously noted, the Tribes waited over a century to institute formal action to enforce their Treaty right. Of course, the United States, as Trustee for the Tribes, also bears responsibility for the delay; however, as against innocent third parties  particularly the Shellfish Growers and Private Property Owners  the delay weighs against absolute injunctive relief.
As to the fourth factor  related misconduct by the plaintiff  there is no evidence of misconduct on the Tribes' part. Fault for creating this controversy lies squarely with the State of Washington and the United States, for selling the tidelands and not objecting to the sale, respectively.
Factors five and six  the relative hardships of the parties and the interests of the public and third parties  are in this case somewhat related. As to the Tribes, denying the shellfishing right entirely would be a significant hardship. Allowing unfettered access to the Growers' and Owners' property, however, arguably creates a more significant hardship, given their reasonable expectation of quiet enjoyment and/or commercial development of their land. The hardship is particularly compelling with respect to the Growers, who have invested substantial resources in their commercial operations. The interests of the public are represented by the State of Washington, a party to this action, and the Court acknowledges the general interest of the public in the recreational use of the State's resources, including shellfishing. Moreover, the Court acknowledges that, by including the Shellfish Proviso in the Treaties, the negotiators of the Stevens Treaties sought to protect and aid the development of a shellfish industry, presumably to benefit the public generally. See, e.g., Washington II, 873 F.Supp. at 1437-38.
In light of these factors,[8] then, the Court believes that the Tribes' Treaty shellfishing right must be subjected to reasonable time, place and manner restrictions[9] when the right is exercised on the Growers'[10] or Owners' property. In finding that some affirmative right to fish on such private property must be enforced, the Court notes that there are less than 15,000 individual members of the party Tribes. Of these, many do not live on the various reservations and thus are not likely to participate in shellfishing activities. Similarly, in imposing restrictions on the right to fish on commercial and private property, the Court notes that the Growers own or lease only a small fraction of the relevant tidelands (approximately 9500 acres), and that the Tribes likely will not fish on many Owners' property because it simply is not practical to do so, given the low concentration of shellfish. Thus, this balancing vindicates the Owners' and Growers' reasonable expectations without unnecessarily impinging on the Tribes' right to fish.

III. Additional Definitions
Before setting forth specific implementation procedures, it is necessary to resolve certain issues raised by the parties:

A. Whether artificial beds hereafter created by the State to enhance recreational activities for its citizens should be subject to a Treaty allocation
The Shellfish Proviso in the Stevens Treaties precludes Tribes from harvesting on "any beds staked or cultivated by citizens." The Court finds that the term "citizens," as used in the Treaties, includes the State of *1460 Washington, when the State acts on the behalf of the public.[11]
The testimony at the hearing on implementation indicated that when the State creates artificial beds, it does so for the benefit of all its citizens, many of whom visit state parks to participate in recreational shellfishing. Mr. Cleveland Pinnix, Director of Washington State Parks, testified that the attendance at the state parks has been increasing steadily for several years and that one of the reasons for the increase in attendance is the public's desire to engage in shellfishing activities. In addition, Mr. Pinnix testified that the Parks Department hoped to continue planting shellfish because "[w]e have a limited resource at state parks. We have a great deal of public interest. Our hope is to expand the recreation opportunities for other people of the state."
Based on the uncontradicted evidence presented by the State, it is clear that when the State fosters the growth of shellfish on state property, it acts on behalf of its individual citizens.[12] Accordingly, to the extent that the State hereafter creates artificial shellfish beds on public property, those beds shall be deemed "staked or cultivated by citizens" and thus excluded under the Shellfish Proviso from the Tribes' Treaty right. Members of the Tribes, however, shall have the same access to such beds as all other citizens. The Court is not persuaded that United States v. Washington, 759 F.2d 1353 (9th Cir.1985), compels a different result.

B. Further Refinement of the Definitions of Natural and Artificial Beds

1. Natural Shellfish Beds
In the Court's Memorandum Decision and Order, the Court held that natural beds could not be staked or cultivated by citizens. See Washington II, 873 F.Supp. at 1440. The Court did not, however, determine what minimum quantity of shellfish constitutes a bed  that is, for example, do two clams constitute a natural bed that cannot be staked or cultivated? Subject to the provisions, infra section III.B.2., regarding existing beds on Growers' property, the Court believes that clarification of the definition of a natural bed is necessary to enable the Tribes and the Growers to implement the Tribes' Treaty right while promoting the growth of the industry generally.
The evidence presented to the Court during both the May 1994 trial and the May 1995 implementation hearing suggests that the Court should further refine the definition of a natural shellfish bed so that it corresponds to the usage at treaty time, namely that a natural bed should be defined quantitatively. The Court, in its Memorandum Decision and Order, discussed at great length the influence of the East Coast shellfish industry on the treaty negotiators, noting that East Coast shellfish practices likely were representative of the common practices of both the industry generally and the West Coast shellfishing industry specifically. See, e.g., Washington II, 873 F.Supp. at 1431-34.
Specifically, the 1876 report of Lt. Paul DeBroca,[13] cited in the Court's opinion, defined a "natural bank" as a
conglomeration of mollusca presenting a character of continuity.... The natural bank may be single or formed of several smaller banks, separated by greater or less spaces, but always sufficiently connected to be considered parts of one whole. As to places where, through accidental circumstances, isolated oysters have developed, *1461 they are not classed among the natural beds, since, if this were the case, the largest part of the submarine soil of the coast would be under interdiction and oyster culture would be impossible.

Id. at 1432 (citation omitted) (emphasis added). From that definition, it is clear that the industry placed no restrictions on planting or cultivation activities on naturally occurring beds comprised of only isolated oysters because such a restriction would unduly interfere with the industry's growth by precluding cultivation on "the largest part of the submarine soil."
Other evidence offered at the May 1994 trial supports this interpretation of a natural bed. Indeed, the evidence established that the shellfish industry considered a "natural bed" to be one that could support a commercial livelihood. The Court is not persuaded by the Tribes' arguments that a commercial or quantitative definition is inappropriate since they also fish for ceremonial or subsistence purposes. While the Court acknowledges that fact, the reasons that the Tribes fish are not relevant to the industry's definition of a natural bed at treaty time.[14]
Thus, in light of the practices and understandings in the shellfish industry that existed at treaty time, it is clear that a quantitative definition of a natural bed is appropriate. In order to preclude future disputes among the parties, the Court further defines a "natural shellfish bed" as follows: a natural shellfish bed is a bed which is capable of sustaining a yield of shellfish that will support a commercial livelihood. Based on the evidence presented, it is clear that this quantity will vary by species. Evidence offered by the parties indicated that the minimum quantity for manila clams ranged from .5 pounds per square foot to 1.15 pounds (and higher) per square foot, and the Court finds that the minimum quantity that will support a "commercial livelihood" is at least .5 pounds of mature clams per square foot. The relevant quantities for other species shall be determined by the parties' agreement, or though the use of the dispute resolution procedures in the Implementation Plan.
This definition of a natural bed applies only in the context of determining what beds may be "staked or cultivated by citizens." It does not purport to limit the Tribes' right to take shellfish from natural beds which do not meet the relevant minimum quantity threshold.[15]

2. Artificial Shellfish Beds
The Shellfish Proviso exempts from the Tribes' Treaty right beds which are staked or cultivated. In its December 1994 Memorandum Decision and Order, this Court distinguished such so-called artificial beds from natural beds, from which the Tribes have the right to harvest shellfish, setting forth definitions of both types of beds. Faced with the practical difficulties, discussed below, in categorizing beds on the Growers' property, the Court finds the following refinement of the definition of artificial beds both necessary to effectuate an implementation plan and appropriate in light of equitable considerations with respect to existing beds on property owned or leased by Growers licensed by the State of Washington.
*1462 The parties all agree that any shellfish beds created exclusively by the Growers' efforts "by scratch," as it wereare not subject to tribal harvesting, as such beds are clearly "staked or cultivated" within the meaning of the Shellfish Proviso. There is less agreement among the parties, and less clarity under the Proviso, in connection with the remaining beds. At first blush, it might appear that determination of whether a bed is "natural" or "artificial" is an easily soluble though heavily fact-driveninquiry. This, unfortunately, is not the case. The evidence presented suggests that a number of types of shellfish beds exist:[16] (1) those created by scratch (which are clearly artificial);[17] (2) those enhanced by the Growers' positive efforts, such as planting, netting or seeding pre-existing shellfish beds; (3) those enhanced by the Growers' preventative efforts, such as predator control or rototilling in or around pre-existing beds; (4) those beds whose existence is due to the Growers' efforts, albeit passively, such as the "natural" migration of shellfish from an artificial bed to a new spot; and (5) those beds whose existence is entirely due to the natural propagation of the species (clearly natural beds).
As discussed below, the Court finds that, as to existing shellfish beds on the Growers' property, only those beds in the fifth category are subject to the Tribes' Treaty right, and that the remaining categories of beds are "staked or cultivated" within the meaning of the Proviso. Specifically, the Court finds that the term "cultivated" encompasses the wide range of techniques used by the Growers to enhance production of shellfish on their property, including, but not limited to, the so-called positive, preventative and passive techniques described above.[18] Further, the Court finds that, even if shellfish begin to set naturally in an artificial or de facto artificial bed, such bed will retain its artificial character and thus remain exempt from tribal harvestingthat is, once a bed is determined to be artificial, it shall remain an artificial bed unless it is abandoned.
The Court believes that this categorization is appropriate because, based on the evidence adduced at the hearing,[19] it appears that it would be very difficultif not impossibleto develop a "snapshot" of existing shellfish beds at the time commercial development commenced on the Growers' property. Further complicating the issue is the fact that shellfish beds are not static. Consequently, the Court simply does not, and cannot with any degree of certainty or precision, know what shellfish beds would exist had the Growers never commenced their farming activities, and any attempt to classify presently existing beds without such information would be speculation at best.
Also weighing in favor of a broader definition of "cultivated" with respect to the Growers' property is the fact that the Court does not believe that the Tribes should benefit from the Growers' efforts. Permitting the Tribes to harvest fifty percent of the shellfish from de facto artificial beds would confer a windfall on the Tribes,[20] and would neither protect nor encourage the growth of the shellfish industry.
Notwithstanding this broad definition of "staked or cultivated," however, no bed will be deemed artificial or de facto artificial merely because it lies on the Growers' property. There may be numerous beds on the Growers' property of which the origin is unknown; these may include beds whose existence is entirely due to the natural propagation *1463 of the species. Such beds are subject to tribal harvesting under the Treaties.
In sum, existing artificial and de facto artificial beds are excluded from the Tribes' Treaty right. As to beds which may hereafter develop or be created or enhanced, the status of such beds will be determined by reference to the definition of a natural bed, see supra section III.B.1., and the implementation procedures governing the creation of new artificial beds.[21]

IV. The Implementation Plan
In formulating the following implementation procedures, the Court has considered several issues. As previously discussed, the Court has applied equitable principles to balance the hardships among the parties and has further refined definitions of certain words in the Shellfish Proviso in order to resolve certain practical problems involved with implementation. Although the implementation procedures adopted below are at times specific, the overall Plan is essentially general in nature to enable the parties to resolve their disputes without Court intervention. Finally, the Court notes that the rights of the Tribes, as set forth in this Order, are tribal rights, not individual rights; consequently, it is for the Tribes to determine how each tribal allocation shall be distributed.
In order to accomplish the implementation of the Court's Memorandum Decision and Order, the Court ADOPTS the following procedures [the following sections 1 through 9 shall be referred to as the "Implementation Plan" or the "Plan"]:

1. INTRODUCTION

1.1 Objectives of Plan.

The primary objective of this Implementation Plan is to provide a framework, principles, and course of action for effective cooperative management of the shellfish resources subject to Treaty harvest under the Court's decision of December 20, 1994. In effectuating the rights of the Tribes to take shellfish under the Treaties, this Order also recognizes the State's responsibilities for conservation of public shellfish resources, subject to the Treaty right to take fish at usual and accustomed places.

1.2 Goals and Procedures.

The Implementation Plan calls for interim and then long term management plans. The management plans are to provide both Treaty and non-Treaty shellfishers, subject to their respective regulatory authorities, the opportunity to harvest their respective shares in an orderly manner, consistent with resource protection. The Plan also provides specific procedures for tribal and non-tribal harvest on State and private lands and waters. To the extent specific procedures in section 6 (applicable to commercial Shellfish Growers) and 7 (applicable to Private Property Owners) conflict with general provisions of the Plan, the relevant specific provisions apply to the Growers and Owners, respectively.

1.3 Application of Law.

All provisions of this Plan and all management plans that are developed from it must comply with the Court's December 20, 1994 decision. No part of this plan is intended to repeal any prior decision in United States v. Washington.

1.4 Requirement of Coordination Among Tribes.

The Tribes will be responsible for coordination with all affected Tribes in the development of management plans or compliance with the interim plan, below. This requirement, however, shall not relieve any party of the obligation to give any notice required herein to any affected party.

1.5 Tribes Bound.

The Tribes bound by this implementation plan are: Lummi, Nooksack, Upper Skagit, Swinomish, Tulalip, Muckleshoot, Suquamish, Puyallup, Nisqually, Squaxin Island, Skokomish, Port Gamble S'Klallam, Jamestown S'Klallam, Lower Elwha S'Klallam, Makah, Hoh, Stillaguamish, Sauk Suiattle and Quileute. Other Tribes may become signatories *1464 to this Plan by the agreement of all parties to the Plan or by order of the Court.

1.6 Shellfish Sanitation Consent Decree.

The Consent Decree Regarding Shellfish Sanitation Issues, entered by the Court on May 4, 1994, specifies those public health requirements to be applied to Treaty shellfishing activities and establishes an intergovernmental, cooperative system for monitoring, enforcement, and dispute resolution. This Implementation Plan, along with all management plans and agreements reached pursuant to it, shall be developed, applied and interpreted in a manner consistent with that Consent Decree.

1.7 Status of Headings.

The headings in this Implementation Plan are for the convenience of the reader and are not intended to change the substance of the Plan.

2. PRINCIPLES OF SHARING THE SHELLFISH RESOURCE.

2.1 Effective Date of Allocation; Mandating Equitable Adjustments.

The effective date of this Implementation Plan for purposes of calculating allocation of shellfish between tribal and nontribal harvest shall be the date of this Order, unless otherwise agreed between the State and Tribes. With respect to shellfish on the Growers' and Owners' property, the allocation between tribal and non-tribal harvest shall commence on the date a Tribe gives notice pursuant to Plan sections 6.1 and 7.1, respectively.

2.2 Cooperative Management.

Where data is not available to determine the total allowable harvest for purposes of allocation between the Tribes and State, the Tribes and State shall develop a cooperative approach to management with the goal of maximizing harvest and equalizing allocation, consistent with conservation of the resource. This shall apply for both interim and permanent management plans and agreements.

2.3 Sustainable Harvest Biomass.

"Sustainable harvest biomass" means the approximate portion of a shellfish resource that can be harvested from a shellfish population on an annual basis in perpetuity. It is analogous to the "sustained yield" or "harvestable surplus" that biologists, using sound and accepted management methods, determine can be harvested from a shellfish bed, or mobile shellfish population, while preserving the ability of the remaining shellfish population to maintain annual production of the sustainable harvest biomass in perpetuity. For certain species, such as crab and shrimp, the sustainable harvest biomass may be achieved by agreed restrictions on the size or sex taken, and/or quantity or location by limiting the type of gear used for the fishery, ensuring that a portion of the biomass remains unharvested.[22]

2.4 Management Objectives.

"Management Objectives" means the objectives of each party to meet their respective goals using their share of the harvestable surplus of the resource and the biological goals for the continued long term health of the resource.

2.5 Sharing Provisions.

Each Tribe may take, from natural beds, up to fifty percent of the sustainable harvest biomass of any shellfish species within the usual and accustomed areas for that Tribe. The sharing shall be achieved by coordinated management plans. Such sharing shall be subject to the following provisions:
a. Sharing Sustainable Harvest Biomass. The sustainable harvest biomass of a shellfish bed or shellfish resource subject to the Treaty right shall be determined on an annualized basis or other agreed periodic *1465 basis. The sharing of shellfish shall take into account all commercial and non-commercial harvests from the sustainable biomass of shellfish. For intertidal areas, the sustainable harvest biomass shall be shared on a bed by bed basis,[23] or on other established boundaries of a public land[24] parcel for sharing the shellfish. Where the sustainable harvest biomass cannot be calculated for a species or area, the harvestable amount to be shared shall be determined using the best fishery management information and practices that ensure conservation and maintain production of shellfish in the area harvested.
b. Adjusting Imbalances. Unless otherwise agreed, all management plans adopted pursuant to this Implementation Plan shall include provisions for addressing imbalances in harvest where a party was not afforded the opportunity to attain its share. The means for addressing imbalances may vary depending upon the species, the management techniques used for specific fisheries, and management imprecisions.
c. Independent Management Discretion. The State and affected Tribe(s) shall have discretion to decide their respective management objectives for the harvest of their respective shares, whether commercial, recreational, ceremonial, or subsistence use.
d. Overlapping Usual And Accustomed Areas. Where two or more Tribes have overlapping usual and accustomed areas, then the combination of tribal harvesting shall not exceed fifty percent of the sustainable harvest biomass, leaving at least fifty percent of the sustainable harvest biomass for non-Indian management.
e. Intertribal Allocation. Allocating the tribal share among affected Tribes shall be determined by the affected Tribes, with the intertribal agreement as appropriate provided to the State. Lack of an intertribal sharing agreement shall not entitle a combination of Tribes to take more than fifty percent of the sustainable harvest biomass of shellfish in a given area.
f. Equal Opportunity. In sharing the opportunity for harvest of a shellfish resource, the State and Tribe may also consider the time of fishing, quality of the shellfish, ease of harvesting, and catch per unit effort for the shellfish involved to ensure that there is equal sharing of the harvest opportunity.
g. Polluted Shellfish And Shellfish Not Available. In allocating the sustainable harvest biomass between the State and affected Tribe(s), shellfish beds that are not presently harvestable due to pollution, development, or other physical causes shall not be counted in the biomass of shellfish beds which can be harvested. This shall not prevent a relay harvest of polluted shellfish in accordance with the Consent Decree Regarding Shellfish Sanitation Issues. Any such relay harvest from a polluted shellfish bed shall be accounted for and allocated separately from sharing of shellfish beds that are approved under Consent Decree.
h. Planted Oyster Beds. Oysters planted on public lands, such as on certain State Parks, that would not exist but for the State having planted those oysters are not subject to a tribal share. The Treaties did not reserve any right to such artificial oyster beds.
i. Beds Staked And Cultivated. To the extent that any shellfish bed on public land is within the definition of "any beds staked or cultivated by citizens" in the Court's relief applicable to commercial Shellfish Growers, then such shellfish beds on public lands are not subject to tribal sharing.
Further, the provisions of section 6.3, related to the creation of new artificial beds, are applicable if the State proposes to create any new artificial beds on public land.

3. LONG-TERM AND INTERIM MANAGEMENT PLANS FOR THE SHARING OF SHELLFISH RESOURCES ON PUBLIC LANDS OR IN PUBLIC WATERS.

3.1 Management Plans.

Ultimately, tribal and non-tribal harvests of shellfish on public lands and from public *1466 waters[25] will take place pursuant to management plans.[26] Those management plans will be developed between the Tribes and State on a government-to-government basis. Once agreed by the parties to the plan, each such management plan shall be effective without further approval of the Court and shall have the same force and effect as this Order.[27]

3.2 Harvests Included.

All tribal harvests of shellfish by Tribes participating in this Implementation Plan, and all non-tribal harvests in areas included within the collective usual and accustomed grounds and stations of the Tribes participating in this Implementation Plan, will be subject to management plans adopted pursuant to this Implementation Plan.

3.3 Interim Plan Needed.

Because development of management plans is a long term process, an interim plan is needed to govern all shellfisheries pending adoption of permanent plans.

4. INTERIM PLAN FOR STATE AND TRIBAL HARVEST OF SHELLFISH ON PUBLIC LANDS OR FROM PUBLIC WATERS.

4.1 Scope of Interim Plan.

This interim plan shall govern shellfisheries from the date of entry of this Order until permanent or long term management plans are adopted for particular species of shellfish. The interim plan sets out procedures all persons and parties covered by this Implementation Plan shall follow until permanent or long term management plans are adopted.

4.2 Closure of Commercial Shellfisheries.

The State and Tribes shall close all commercial shellfisheries and prohibit the commercial landing of all shellfish on public lands or from public waters, within thirty days after entry of this Order, except where a signed interim agreement between the State and all affected Tribes is in place regarding a specific commercial shellfishery.

4.3 Adjusting Non-commercial Fisheries.

After entry of this Order, the State shall adjust non-commercial shellfisheries within forty-five days after any Tribe makes a written request to the Washington Department of Fish and Wildlife (WDFW) to do so, if necessary to ensure that no more than fifty percent of the harvestable amount will be taken by tribal or non-tribal fisheries, including commercial and non-commercial combined. A dispute over the necessity or extent of the adjustment to be made shall be subject to the dispute resolution procedure of sections 4.7 and 4.8.

4.4 Shellfish Beds With Inadequate Data.

For beaches where data is not available for determining the sustainable harvest biomass and allocation between the State and all affected Tribes, the affected Tribes and the State will:
a. manage the beach to allow for affected Tribes to take up to fifty percent of the jointly estimated shellfish harvest opportunity until more specific data is available.
b. jointly identify shellfish beds needing a survey and develop a prioritized list and time line to complete surveys and provide for more accurate management and sharing on these beaches, within efficient biological management.

*1467 4.5 Opening A Fishery By Agreement.

Where no interim agreement is in place thirty days after the entry of this Order, a shellfishery closed or adjusted pursuant to section 4.2 or 4.3 may only be opened or enlarged after compliance with the procedures in section 4.6. Shellfisheries may proceed at any time, however, if agreement is reached between the State and all affected Tribes, notwithstanding the procedures otherwise applicable under this section.

4.6 Opening A Fishery Without Agreement.

Where the State or a Tribe desires to open or enlarge a shellfishery that has been closed or adjusted pursuant to section 4.2 or 4.3, it shall comply with the following procedure (unless an interim agreement is in place):
a. Before proceeding, the State and all affected Tribes shall confer at least one time in an effort to reach agreement regarding the proposed fishery.
b. Failing agreement, the party (Tribe(s) or State) proposing to open the fishery shall provide to the other party a proposed regulation for the fishery, in writing, at least fourteen days before the fishery is scheduled to begin. The party proposing the harvest shall be able to provide a sound fisheries management basis for a determination that a harvestable surplus exists and that a fishery can be operated that will not interfere with the sharing principles ordered by this Court. However, this is not intended to shift the burdens, described below, associated with contesting a fishery. The regulation (or other documents provided with the regulation) shall contain, at a minimum, the following information:
(1) The dates and hours the fishery will be open;
(2) The catch area(s) open for harvest;
(3) The type of fishery to be opened (commercial or non-commercial);
(4) The species to be taken, including an estimate of or upper limit on the amount to be taken and the basis of the estimate;
(5) The estimated effort;
(6) The gear to be allowed;
(7) Provisions for recordkeeping and harvest reporting, including a schedule to ensure a timely exchange of information; and
(8) Any other information necessary for a specific fishery (such as, for example, daily limits for non-commercial fisheries).
In addition, information regarding enforcement and monitoring plans for the fishery shall be available to the State or Tribes upon request.

4.7 Contesting State or Tribal Regulations and Dispute Resolution.

A Tribe or the State may object to a proposed regulation. The party objecting must state the objection in writing and serve it on the entity proposing the fishery not more than ten days after receipt of the regulation, and at least three working days before the fishery is scheduled to begin. The objection must be based on a well-founded assertion that the proposed regulation would result in:
(1) an overharvest on an allocation or conservation basis in violation of the standards set by the Court in United States v. Washington, or other conservation standards agreed to by the State and affected Tribes; or
(2) otherwise violate this Implementation Plan or other applicable orders of the Court. The objection must state the reasons for the objection, the data on which it is based, and any other pertinent information available to the objecting party.

4.8 Dispute Resolution During Interim Plan.

No contested fishery shall begin unless a decision is rendered by a Special Master to allow the fishery. To the extent necessary, the Special Master may order the State or affected Tribe to comply with the allocation and sharing principles described by this order. In addition, the following rules shall apply:
a. The objecting party shall arrange for a hearing to be held before a Special Master no more than ten working days from the date *1468 of service of the objection (see Dispute Resolution, section 9).
b. The Special Master shall render a decision no more than ten working days after the conclusion of the hearing. No fishery shall open until a decision is rendered by the Special Master.
c. Where an emergency exists, (for example, where the proponent's opportunity to fish may be lost by delay), the Special Master may change the above time limits if the party requesting a change in the time limits has acted in a diligent and timely manner.

4.9 Obligation to Adjust Catch and Comply With Sharing Order.

Where there is a shellfish harvest without agreement, the State or affected Tribe(s) shall either comply with this section as needed, or contest the regulation as provided above. When a Tribe authorizes the harvest of shellfish without agreement, then the State shall reduce or adjust State regulated harvests as necessary to allow for the proposed tribal harvest. State regulated harvests shall not take a tribal share of shellfish as defined by the sharing principles, above. Tribal or State fisheries opened under this subsection shall not exceed the tribal or State share authorized by this Court and shall be adjusted by the Special Master, if necessary, to comply with and not exceed the tribal or State share.

4.10 Tribal Ceremonial Shellfish Harvests.

Notwithstanding the provisions of section 4.2 through 4.9, a Tribe may open a fishery for unanticipated ceremonial purposes by emergency regulation for a specific time period and for a specific allowable harvest amount.

5. DEVELOPMENT OF PERMANENT PLANS TO GOVERN STATE AND TRIBAL HARVESTS OF SHELLFISH FROM PUBLIC LANDS OR PUBLIC WATERS.

5.1 Order to Develop Plans.

Long term management plans shall be developed separately for each species of shellfish (or groups of related species, such as all crab species) for which fisheries are to take place on public lands or from public waters. Those management plans may be divided into sub-plans for specific geographic regions, for types of fisheries (commercial, noncommercial; subtidal, intertidal; etc.), or on any other agreed basis. Each management plan shall govern both tribal and State shellfisheries. Unless otherwise agreed, each management plan shall be subject to comprehensive review and agreement by the State and Tribes every five years.

5.2 Order to Share Information and Establish Planning Committees.

The State and Tribes shall exchange all available information in either side's possession regarding the status of shellfish populations and fisheries taking place on those populations, in response to reasonable requests for the same, to assist in carrying out their management responsibilities.

5.3 Joint Technical Working Committee.

In addition, the State and Tribes shall establish a joint technical working committee to perform tasks, including the following:
a. Exchange and review new and existing information;
b. Establish assessment methodologies;
c. Identify and prioritize management needs;
d. Develop annual or other periodic management plans.

5.4 Elements of permanent plans.

In addition to complying with the allocation ordered by the Court or otherwise agreeing, certain basic elements should be included in all management plans between State and Tribe(s). Those elements include:
a. Definitions of relevant terms.
b. Procedures for identification of the location of shellfish resources.
c. Procedures for assessing and estimating shellfish populations and the sustainable harvest biomass.
d. Identification of geographic boundaries to be used for management and allocation of shellfish harvests (management or allocation "units"), including procedures for how and *1469 when boundaries can be modified once adopted.
e. Identification of management periods and the duration of management plans.
f. Procedures for establishing the amount to be harvested from each management area.
g. Procedures for establishing how allocations will be measured for each management or allocation unit. In intertidal areas, unless otherwise agreed or determined by the Court, harvest management shall afford both Treaty and non-Treaty harvesters the opportunity to harvest fifty percent of the harvestable shellfish resource on each public beach, or tideland parcel having established or agreed boundaries, so long as consistent with public health and conservation requirements.
h. Procedures for enacting pre-season and in-season regulations. These will include the amount of notice to be given before a fishery begins and requirements for exchanges of information.
i. Provisions regarding the content of regulations. At a minimum, these will include identification of the management plan under which the regulation is issued, the species to be harvested, the harvest areas, the purpose of the harvest, the gear to be used, the expected effort, the expected harvest, and the dates and times of opening and closing of the fisheries. Unless addressed in a Tribal Ordinance, the regulations will also identify the monitoring system to be used.
j. Provisions regarding law enforcement for Treaty and non-Treaty shellfishing.
k. Provisions for recordkeeping and harvest reporting shall include: commercial WDFW shellfish receiving tickets, Treaty Indian receiving tickets, agreed sport harvest estimates, and agreed Treaty Ceremonial and Subsistence estimates.
l. Provisions for identification of tribally authorized harvesters taking shellfish and tribal representatives engaged in surveys, population estimates, and other management activities, including tribal fish managers, as well as tribal enforcement personnel.
m. Provisions for modifications of management plans.

6. COMMERCIAL SHELLFISH GROWERS.
The parties are bound by the definitions prescribed by the Court in this Order, the December 20, 1994 Memorandum Decision and Order; and any other relevant order in United States v. Washington.

6.1. Determination Of Location Of Beds.

Determination of the location of artificial beds on property owned or controlled by a Grower is triggered by notice to the Grower of the Tribe's interest in commencing harvest.
6.1.1 Any Tribe interested in commencing harvest on property owned or controlled by a Grower shall provide notice to other affected Tribes and to the Grower. The notice shall specify the particular property owned or controlled by the Grower upon which harvest is to occur, and shall include the name, street and mailing addresses, and telephone number of a tribal representative. Upon receipt of this notice, the Grower shall then provide the requesting Tribe with the following: the location of all artificial beds on any property owned or controlled by the Grower; a list of the species of shellfish currently harvested from the artificial beds and from which bed a particular species is harvested; and a description of the means used by the Grower to demarcate portions of the property for purposes of managing or keeping records of shellfishing activities.
In addition, the Grower shall provide the following information for each bed asserted to be artificial: all records showing seeding, graveling, transplanting or other activity relevant to determination of each asserted artificial bed's status as an artificial bed; and all other records or other information upon which the Grower relies to support the Grower's assertion that each bed is artificial. However, such information shall not be required where an artificial bed is presumed to exist because the bed consists of the following: (1) a species that is known not to reproduce naturally in that location, such as Pacific Oysters outside of Hood Canal or (2) shellfish cultivated by an off-bottom or equivalent method.
*1470 The Grower shall provide all the information required by this section to the Tribes in writing within sixty days of the receipt of any tribal request. At a Grower's request, the Tribe shall sign a nondisclosure agreement which will protect any sensitive information provided to the Tribes. The presentment and signing of any nondisclosure agreement shall not be construed as giving the Grower more time in which to provide the required information to the Tribe.
6.1.2 The Tribes shall review the data provided by the Grower(s). In addition, the Tribes shall be given the opportunity to inspect the artificial beds located on the land owned or controlled by the Growers. The Tribes shall give the Grower fourteen calendar days' notice prior to the proposed date of inspection. The inspection shall occur as noticed by the Tribes and shall take place at a reasonable time. The Grower may accompany the tribal representatives during the inspection.
6.1.3 If the parties agree that the Grower has accurately stated the nature, extent, and location of all artificial beds located on the property, the parties shall then determine the sustainable harvest biomass, as defined by this Plan in section 2.3, from the Grower's beds subject to a tribal share. The sustainable harvest biomass shall not include shellfish found in areas that are closed to shellfishing due to pollution. If the parties are unable to agree on the sustainable harvest biomass for a particular bed or group of beds, the matter shall be submitted to a Special Master.
6.1.4 If the parties agree on the nature, extent, and location of all artificial beds and the sustainable biomass from the beds subject to a tribal share, harvest shall commence according to the provisions specified below. Harvest shall also commence to the extent that there is agreement as to any bed or group of beds, meaning that the parties need not be in full agreement as to the location of all artificial beds and as to the sustainable biomass of all beds subject to a Treaty share prior to beginning any harvest. To the extent of any disagreement which the parties are unable to work out themselves, the parties shall submit the issue to a Special Master. The burden of proof shall be with the party asserting that a particular bed is an artificial bed.

6.1.5 Times When The Tribes May Give Notice Under Section 6.1.1.

Tribes initially have one year after the date of this Implementation Plan to give notice pursuant to section 6.1.1 to Growers subject to the Implementation Plan. After that year, a Grower may operate free of additional notices or tribal claims for a three-year period. At the end of the three years, the Tribes shall have a ninety-day period during which they may provide notice pursuant to section 6.1.1. At the end of that ninety-day period, the Grower shall again have a three-year period free from additional tribal notices or claims. The ninety-day open period for giving notice under section 6.1.1 shall continue to alternate thereafter with a three-year period during which such notice may not be given.

6.2 Harvest Plans.

Not later than thirty days after a final determination has been made of the location and of all artificial beds, whether by agreement or through dispute resolution, the Tribe shall provide the Grower with a written statement describing its plan for sharing the harvest of shellfish outside the artificial beds including the general times of the proposed harvests.
The Grower shall then review the Tribe's proposal to determine if it is compatible with the Grower's farming operation. If the Grower determines that the Tribe's submitted plan is not compatible with his or her particular farming operation, the Grower may modify or revise the tribal plan accordingly. The Grower shall have the final word on how a tribal harvest will be conducted.
Any harvest plan, whether one drafted by the Tribe or by the Grower shall contain, at minimum, the following time, place, and manner restrictions on tribal access and harvest in order to protect the Grower's farming operation: (1) the time for a tribal harvest; (2) the species of shellfish and the location from which they will be harvested; (3) the number of tribal harvesters that can safely be present on a bed to conduct a harvest; (4) the appropriate method of access that will avoid damage to the Grower's crops; (5) the *1471 method of harvest, e.g., blanket or spot digging.
Although any tribal harvest will be done according to the requirements set forth by a particular Grower, the Growers are expected to act in good faith and to not impose any more restrictions on a Tribe than are necessary to protect the Grower's farm. In addition, the Grower may not so restrict the Tribe as to deny the Tribe the right to its tribal share. With respect to any harvest plan drafted by a Grower, the affected Tribe(s) may take the plan to a Special Master only if the plan prevents the Tribe(s) from taking the tribal share.
If, during any harvest, the Tribe takes shellfish from beyond the agreed upon boundaries or causes any damage to the Grower's property, the parties shall attempt to resolve the matter informally. If there is no resolution, the parties shall submit the matter to a Special Master; the Special Master can award appropriate damages or impose some other remedy.
No Grower may, instead of providing a Tribe the opportunity to harvest, insist that the Tribe take a money payment or take shellfish harvested by the Grower, as the tribal right is a right to take the shellfish by a tribal harvest. Nothing in this Plan, however, shall be interpreted to foreclose the parties from voluntarily negotiating such an agreement; the Grower simply may not force such an agreement on any Tribe.

6.3 Creation Of New Artificial Beds.

Nothing in this Plan shall be construed to limit a Grower's ability to create a new artificial bed. If a Grower plans to create a new artificial bed, the Grower shall give written notice to the affected Tribe(s) of his or her intention. The notice shall be provided at least forty-five days prior to the proposed creation of the bed and shall include the following: the location and species of the proposed bed. In addition, the notice shall explain the basis for the Grower's belief that there is no natural bed in the location where the artificial bed is planned.
If a Tribe contests the Grower's conclusion that there is no natural bed in the location of the proposed artificial bed, the Tribe shall so notify the Grower within fifteen days of receiving the notice. The Tribe shall explain the basis for its position. In addition, the Tribe shall be given the opportunity to inspect the location of the proposed bed upon seven days' notice to the Grower. The inspection shall then occur as noticed by the Tribe at a reasonable time. The Grower may have a representative accompany the Tribe during the inspection.
If the parties are not able to resolve the matter, it shall be submitted to a Special Master. The party asserting that the area proposed for the new artificial bed is not a natural bed shall have the burden of proof. The Grower, pending the resolution of the matter by the Special Master, will be permitted to continue with any cultivation activities at his or her own risk: that is, the Grower may proceed with his or her plans at the risk that the Special Master could hold that the proposed area contains a natural bed which may not be staked or cultivated under the Treaties.

6.4 Harvest of clams subjacent to artificial oysters.

Because a Grower's oyster crops are at greatest hazard when clams are harvested from underneath the oyster crop, any agreement to harvest the natural clams subjacent to artificially grown oysters shall schedule the time for the tribal harvest between the commercial Grower's harvest of the oysters and replanting of oyster seed. The Tribe shall make itself available to harvest the clams within as small a timeframe as forty-eight hours from the harvest of the oysters by the Grower.
In those cases where the Grower himself or herself does not harvest the underlying clams in order to protect a fragile oyster crop, however, the Grower need not allow tribal harvest of the underlying clams.

6.5 No General Regulation of Grower's activities.

Nothing in this Plan shall be interpreted as interfering in any way with the right of a Grower to engage in predator control activities or in any other activities designed to manage or benefit the Grower's land. Moreover, nothing in this Plan shall constitute a *1472 limit on a Grower's right to redesign his or her tidelands, even if such redesign results in the destruction of a natural bed (e.g., constructing a dike for Olympia Oysters which causes the substrate to change and eliminates a clam bed).

7. PRIVATE PROPERTY NOT USED FOR COMMERCIAL SHELLFISH GROWING.
Determination of the location of shellfish populations, population estimates, and regulations governing the harvest of shellfish from privately owned tidelands not being used for commercial shellfish production shall be subject to both interim and permanent management plans adopted by the Tribes and the State. Included within those plans, however, shall be additional measures applicable to harvests from privately owned tidelands, as described below.

7.1 Population Surveys And Population Estimates.

Tribes shall survey privately owned tidelands to determine the existence of shellfish populations prior to commencing harvest on a particular tideland.
The Tribes' surveys and population estimates shall be made consistent with the following rules, unless otherwise agreed between a Tribe and a Property Owner:
7.1.1 A survey to determine whether shellfish are present shall occur on each privately owned beach no more than once every three years. The cost of the survey is to be paid for by the Tribe. The manner and method of any survey must be of the type currently in use by the State of Washington.
7.1.2 An on-site population estimate shall occur no more than once per year. The cost of any estimate shall be paid by the Tribe.
7.1.3 Shellfish population information and data regarding a privately owned beach shall be shared with WDFW and the Property Owner.
7.1.4 Surveys and population estimates shall be done at reasonable times during daylight hours whenever feasible. Night surveys shall occur only when necessary.
7.1.5 Notice of a survey or population estimate shall be provided to the Property Owner no less than one month in advance of the survey or estimate. The notice shall include the name, street and mailing addresses, and telephone number of a tribal representative responsible for the administration of the survey or population estimate.
7.1.6 Notice shall be provided by certified mail, fax, or personal service. The Tribes may chose the type of service. The Private Property Owner shall provide the address or phone number to the Tribe where that Owner will accept service of the notice. If such information is not provided by the Private Property Owner to the Tribe, notice need only be by publication.
In addition, survey schedules will be made available on a telephone hotline operated by the Tribe, if the Tribe has the means to provide such a hotline.
7.1.7 The Property Owner and the State may have representatives present during the survey and population estimate.
7.1.8 The Tribes need not conduct a comprehensive survey or population assessment of all properties potentially subject to tribal harvesting before being permitted to exercise Treaty harvest rights. However, as to a particular property, a survey or population assessment must be done prior to any tribal harvest.
7.1.9 Nothing in this Plan shall prevent a Private Property Owner from conducting his or her own survey or population assessment. The Private Property Owner may then, if the results of such a survey or estimate differs from the results of the tribal survey or estimate, contact the Tribes in writing and inform them of any discrepancy. If the parties are unable to resolve the matter, it shall be submitted to the Special Master according to the procedure set forth in this Plan.

7.2 Tribal Harvest.

In addition to the rules governing tribal harvests that are contained in management plans developed with the State, tribal harvests from private tidelands shall also be governed by the following requirements:
7.2.1 A tribal regulation opening private property for shellfish harvesting shall take into consideration the density of shellfish present and the size of the area to be harvested *1473 and limit the number of persons who may harvest accordingly.
7.2.2 The regulation opening private property for shellfish harvesting shall provide for monitoring and enforcement of the harvest. The regulation shall also ensure that proper sanitation procedures will be followed by all tribal harvesters.
7.2.3 The regulation opening private property for shellfish harvesting shall indicate the quantity of shellfish that may be taken, limits that apply to individual harvesters, if any, the purpose of the harvest (commercial, subsistence, ceremonial, or a combination), and the dates and times when harvest may take place.
Harvests may occur at night only if necessary. All harvests of properties less than 200 feet in width shall be limited to five days per calendar year. If a property is 200 feet or wider along the beach front, the number shall be increased by one additional harvest day per calendar year for every additional fifty feet of property.
7.2.4 There shall be no upland access to the private tidelands. The Tribes may access the private tidelands by water, across public lands, or by public rights of way only. Nothing in this Plan, however, shall prevent a Private Property Owner from voluntarily agreeing to upland access, although no Tribe has a right to insist on such access from the Tideland Owner.
7.2.5 Notice of a tribal harvest on private property shall be provided to the Property Owner and WDFW no less than one month in advance of the harvest. The notice shall include the name, street and mailing addresses, and telephone number of a tribal representative responsible for the administration of the harvest.
7.2.6 Notice shall be provided by certified mail, fax, or personal service. The Tribes shall chose the method of service. The Private Property Owner shall provide the address or phone number at which such notice will be received. If no address is provided, notice may be by publication.
7.2.7 If during any harvest, the Tribe damages the property of a Tideland Owner or in any way fails to harvest as stated in the notice provided to the Owner, the Owner may submit the issue to the Special Master as set forth in this Plan.

7.3 Dispute Resolution.

A Private Property Owner may challenge a proposed tribal harvest of shellfish from their property through the dispute resolution procedure of section 9 by complying with the following requirements:
7.3.1 An objection to a proposed tribal harvest must be made in writing to the Tribe's fishery department, stating the nature of the objection, the reasons for the objection, any data upon which the objection is based, and identifying any documents upon which the objection is based.
7.3.2 An objection must be based on a claim that the Tribe's plan for harvest is not consistent with the Court's orders in this case, an applicable management plan developed pursuant to this Implementation Plan, or other applicable law.
7.3.3 An objection to a proposed tribal harvest must be received by the Tribe not less than five working days before the harvest is scheduled to begin.
7.3.4 If the Property Owner posts a bond in the amount of $10 per lineal feet of waterfront of the property at issue, the Tribe may not harvest pending the outcome of the dispute resolution.
7.3.5 The Special Master shall have discretion as to whether a decision will be made based upon the written submissions of the parties or after a live hearing.

7.4 Rights of Private Property Owners

Nothing in this Plan shall be interpreted to limit in any way the rights of a Private Property Owner to build docks or other structures on their property.

8. MISCELLANEOUS PROVISIONS.

8.1 Proposals To Establish New Artificial Shellfish Beds.

8.1.1 The State shall exercise powers granted under State law regarding permits needed for shellfish enhancement (shellfish transfer permit, import permit, Hydraulic Project Approval). A person seeking to *1474 plant shellfish seed, place gravel or other substances, or otherwise enhance natural shellfish populations through additions to the natural environment in or beneath state waters, shall comply with these requirements. When an application is received to undertake such an activity, the authorizing Department shall within five working days notify the Tribes by mailing a copy of the application to each affected Tribe's fishery department.
8.1.2 Before granting such a permit application, the appropriate State Department may ascertain the status of existing shellfish populations, if any, where the activity is proposed to occur, to determine whether a natural shellfish bed exists. Where a Department of the State performs the assessment of existing shellfish populations, the Department shall establish procedures whereby the Tribes shall be afforded the opportunity to participate in the assessment of the status of the existing shellfish populations. Where the State chooses not to perform the assessment, the Tribes may perform an assessment.
8.1.3 Whenever the State proposes to grant a permit under section 8.1.1, it shall notify the Tribes at least twenty working days before issuance of a permit. The State shall maintain copies of all documents that establish the basis for the granting of the permit and make them freely available to the Tribes at any Tribe's request. A decision to issue a permit, and the State's conclusion, if any, regarding the presence of a natural shellfish bed, may be challenged by a Tribe and is subject to the dispute resolution procedure if agreement is not otherwise reached.
8.1.4 Any person to whom a permit is issued to enhance shellfish production for commercial purposes shall be subject to any applicable provisions of this plan and the Court's orders to the extent of tribal Treaty rights.

8.2 Proposals To Lease Tidelands Or Bedlands For Purposes Of Commercial Shellfish Growing.

The purpose of this section is to address state leasing of tidelands and bedlands for shellfish harvest and production and to insure any Treaty right to harvest shellfish from such leased premises is addressed prior to leasing. Public lands under lease shall be considered the same as property owned by the lessee during any lease, and are subject to this court's provisions for private property or Growers' property. The following additional provisions apply for all new or renewal leases for shellfish harvest or cultivation.

8.2.1 State Notice to Tribes.

Whenever the State proposes to lease tidelands or bedlands for purposes of a commercial shellfish operation, then the State shall give affected Tribes notice of the lease application and be provided a date certain when the Tribes can communicate to the State regarding the assertion of a Treaty harvesting right to shellfish on the property, in accordance with this section. Notice to the affected Tribes shall include a description of the use to be authorized by the lease. The State shall evaluate the land to be leased to determine whether a natural shellfish population exists. The Tribes shall be afforded the opportunity to participate in the State's assessment of whether a natural shellfish population exists on the land. The results of any state evaluation shall be communicated to the Tribes at least thirty calendar days before a lease is issued. The underlying data and documents shall be made available to the Tribes.

8.2.2 Tribal Assertion of Treaty Right on Leased Land.

If an affected Tribe(s) contends that there is a natural shellfish population subject to Treaty harvest by the Tribe on property to be leased, the affected Tribe may notify the Washington Department of Natural Resources (DNR) in writing at least ten days before the proposed date of leasing. The notice shall describe the shellfish to which the Tribe asserts a Treaty right, the basis for that information, and the area and shellfish involved. Upon timely receipt of such notice, DNR shall not lease the property until compliance with paragraph 8.2.3. or 8.2.4, below. If a Tribe does not provide notice under this paragraph to DNR after DNR has complied with paragraph 8.2.1, then the Tribe shall not take shellfish from the leased property for the initial term of that lease, or ten years, whichever is shorter.

*1475 8.2.3 State and Tribal Agreement.

If a Tribe has provided notice under paragraph 8.2.2, the State and Tribe and/or prospective lessee may agree to a plan where the Tribe's Treaty right to take shellfish from the land to be leased is addressed before issuance of the lease. Any such agreement in writing shall be binding on the State, Tribe, and other persons who enter it for the term of the agreement.

8.2.4 Dispute Resolution.

Absent an agreement between the State and/or proposed lessee for tribal harvest from the bed to be leased, a Tribe or the State may seek dispute resolution. The dispute shall be heard by the Special Master pursuant to section 9, and the lease shall not be issued until the dispute resolution procedure has been completed. At such dispute resolution, the Special Master shall determine whether or not the leased activity authorizes the taking of shellfish subject to Treaty harvest. If the lease does not, then the lease may be issued. If the land to be leased contains shellfish subject to Treaty harvest, then the Special Master shall determine the tribal harvest of a Treaty share of such shellfish, or allow the State and Tribe to reconsider agreement regarding tribal harvest.

8.2.5 State Renewals.

Whenever the State proposes to renew a lease of tidelands or bedlands for purposes of a commercial shellfish operation, if the presence or absence of natural shellfish populations has not previously been completed, the procedures of part 8.2.1 shall be followed as if a new lease is being proposed. If an affected Tribe has previously not objected to leasing of the property after notice pursuant to Section 8.2.1, then the State need only provide such Tribe notice of its intent to lease or renew lease. If the lease only allows the lessee to grow and harvest a species known not to reproduce naturally in the lease location (such as Pacific Oyster beds outside areas of Hood Canal), or to grow and harvest shellfish cultivated by an off-bottom or equivalent method and there has been no natural shellfish population identified on the site during past leases, then the State may satisfy paragraph 8.2.1 by informing the affected Tribe of the nature of the proposed lessee use. The Tribe, however, may inspect such property or assert a claim under 8.2.2, if there is a natural shellfish population subject to a Treaty harvest.

9. DISPUTE RESOLUTION.
Except where otherwise agreed or stated herein, the following dispute resolution procedure shall govern all disputes arising from the implementation of this Plan.

9.1 Selection Of A Special Master.

The parties shall designate persons ["designees"] to serve as Special Masters. One person shall be designated by each of the following: [a] the Tribes; [b] the State of Washington; [c] the Shellfish Growers; and [d] the Private Property Owners. In the event a designee becomes unable or unwilling to continue service, the party that designated that individual shall designate a replacement within thirty days of the termination of the prior designee's service. Any party may change its designee upon thirty days' notice to the other parties. Such changes in designees need not be approved by the Court.
The four designated persons shall serve as a panel of Special Masters for purposes of this dispute resolution procedure; however, a single Special Master will hear and determine each dispute referred to the panel. A random drawing will be used to select the Special Master from the panel for each dispute.

9.2 Procedure For Hearings Before A Special Master.

The Special Masters will establish the procedures to be used in hearing disputes; those procedures may be informal, but shall include the following, except where specified otherwise in this implementation plan:
9.2.1 An opportunity for all parties to a dispute to present their evidence and arguments in writing and orally.
9.2.2 An opportunity for all parties to a dispute to respond to or challenge the evidence and arguments presented by other parties.
*1476 9.2.3 The opportunity for all parties to the dispute to compel the production of persons or documents from other parties that are necessary for full consideration of the matter in dispute.
9.2.4 In addition to considering evidence presented by experts called by a party to the dispute, the Special Master may consult with persons with technical expertise as necessary to the resolution of disputes. The persons consulted shall not be associated with the Tribes, any agency of the State of Washington (other than academic institutions) or any other person affected by the outcome of the dispute, absent agreement of all parties to the dispute. Advice received from a technical expert shall be shared with all parties to the dispute.
9.2.5 The Special Master shall issue a written opinion stating the decision and the reasons for the decision within ten working days of the conclusion of the hearing or the submission of evidence by the parties to the dispute, whichever is later, unless agreed otherwise by the parties and the Special Master. In fashioning resolution to a dispute, a Special Master shall have no authority to eliminate the Treaty fishing rights of an entire Tribe. The Special Master may, however, order that the Tribe pay damages or may implement some other appropriate remedy.
9.2.6 In all cases the Special Master shall assess his or her costs of the hearing against the parties to the hearing in equal amounts except where the Special Master finds that the position of one or more parties was not substantially justified by facts or law, in which case the Special Master shall assess such party or parties all of the costs.
9.2.7 The Special Master shall not be required to hear or consider disputes in the order in which they are presented. The Special Master shall consider a dispute on an emergency or expedited basis when a delay would make the dispute moot due to the closure of a fishing season or other equivalent circumstance.

V. Order
In connection with the execution of the Implementation Plan, the Court HEREBY ORDERS as follows:
1. That the parties enter into management agreements as may be necessary to comply with this Order and execute the Plan.
2. That parties comply with the terms of this Order and comply with all management plans adopted pursuant to this Order, to the extent applicable to that party.
3. That the Defendant State of Washington and its Agencies and Departments, including their officers, agents, and employees are HEREBY ENJOINED from:
a. arresting or prosecuting members of plaintiff Tribes for harvesting shellfish at the usual and accustomed places of his or her Tribe, when the Tribe has allowed the shellfish harvest in accordance with the provisions of the Court's Implementation Plan; and
b. applying or enforcing state statutes or regulations to regulate, limit, or restrict the exercise of Treaty fishing rights, unless such are fully consistent with the Court's decisions and Orders.
4. Provided, however, that this injunction shall not modify or alter any provision of the Shellfish Sanitation Consent Decree entered by the Court on April 21, 1994.
5. That on or before September 29, 1995, the parties in this case designate persons to serve as the original panel of Special Masters for the resolution of any disputes, pursuant to Section 9 of the Plan.
6. That judgment be entered in this action consistent with this Order and the Court's December 20, 1994 Memorandum Decision and Order.
IT IS SO ORDERED
IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail, copies of this Order on counsel for the parties in this matter.
NOTES
[1] United States v. Washington, 873 F.Supp. 1422 (W.D.Wash.1994) [hereinafter Washington II].
[2] United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974) [hereinafter Washington I].
[3] The various Stevens Treaties were negotiated in the 1854 and 1855; the original action to enforce the Tribes' Treaty fishing right was commenced in 1970. See id. at 353-57.
[4] The Catawba Tribe Court held that the Tribe's claim was barred by the statute of limitations; hence, the majority did not reach the question of an appropriate remedy. 476 U.S. at 510-11, 106 S.Ct. at 2046.
[5] The Supreme Court approved this analogy in Washington v. Washington State Commercial Passenger Fishing Vessel Assn., 443 U.S. 658, 690 n. 32, 99 S.Ct. 3055, 3076 n. 32, 61 L.Ed.2d 823 (1979).
[6] The factors suggested by the Restatement to determine the appropriateness of injunctive relief against trespass are as follows:

(1) The nature of the interest to be protected;
(2) The relative adequacy of injunctive relief and other remedies available to the plaintiff;
(3) Any unreasonable delay of the plaintiff in initiating the action;
(4) Any related misconduct on the part of the plaintiff;
(5) The relative hardship of the parties if the injunction is granted or denied;
(6) The interests of third persons and the public; and
(7) The practicality of framing and enforcing the injunction.
Restatement (Second) of Torts § 936(1)(a)-(g).
[7] Unlike a contractually created license or profit, the Tribes' shellfishing right is the result of the negotiation between two sovereigns, the United States and the Tribes. As such, although Congress retains the power to abrogate the provisions of an Indian treaty, "Indian treaty rights are too fundamental to be easily cast aside." United States v. Dion, 476 U.S. 734, 739, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986).
[8] The seventh factor, related to the practicality of formulating injunctive relief, is not at issue in this case: it clearly is feasible to frame and enforce injunctive relief.
[9] In discussing the modification of an injunction relating to the apportionment of certain Indian tribes' fishing rights in the Columbia River basin, the Ninth Circuit has noted that "[i]t is established that `the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the state in the interest of conservation....'" United States v. Oregon, 657 F.2d 1009, 1016 (9th Cir.1982) (quoting Puyallup Tribe v. Department of Game of Wash., 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968)).
[10] In addition, as discussed infra, Section III.B., because of the difficulties in distinguishing artificial and natural beds on the Growers' property, the Court believes that it is also appropriate to refine the definitions of such beds as they are applicable to shellfish on the Growers' property.
[11] To the extent that the term "citizens" might be read to include only natural persons, as the Tribes argued, the Court also finds that equitable considerations warrant treating the State as a de facto citizen when it acts on behalf of its citizens. The five million residents of the State are blameless in this controversy, and the Court believes that the benefits and efficiencies of permitting the State to act on their behalf in growing the State's shellfish resource far outweigh any interest the Tribes have in limiting the artificial bed exclusion to natural persons.
[12] The Court believes that the circumstances presented in this case are analogous to a situation in which, under the doctrine of parens patriae, "`a state that is party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens.'" Alaska Sport Fishing Assn. v. Exxon Corp., 34 F.3d 769, 773 (9th Cir.1994) (citation omitted). For a general discussion of the doctrine, see Hawaii v. Standard Oil Co. of Calif., 405 U.S. 251, 257-60, 92 S.Ct. 885, 888-90, 31 L.Ed.2d 184 (1972).
[13] Entitled "On the Oyster Industries of the United States." Plaintiff's Exhibit PL-237.
[14] The Court notes that during the May 1994 trial, the Tribes themselves argued that the Court should look to the shellfish practices and industry of the East and West Coasts in shaping its interpretation of the Treaties. The Tribes cannot rely on those practices selectively to advocate their position on some issues while ignoring the practices as to others.
[15] The Treaties reserved the right to take fish, including shellfish, from their usual and accustomed grounds and stations subject to the limitation that "they shall not take shellfish from any beds staked or cultivated by citizens." Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); see Washington II, 873 F.Supp. at 1422 n. 3.

Accordingly, the right to take shellfish was not limited to natural beds but rather was exclusive of artificial beds. Consequently, the shellfish industry's working definition of a natural bed that could not be staked or cultivated is relevant only in that narrow context; it does not limit to the Tribes' right to take fish from any "non-artificial" bed.
The Court notes, however, that throughout this Order and at other times in this case, the Court and the parties have used the term natural beds to describe those non-artificial beds from which the Tribes have the right to take shellfish. Such use of that term does not imply a quantitative limit on the beds from which the Tribes may take shellfish.
[16] The examples cited for each category are not meant to be exclusive; rather, they are illustrative of the Growers' efforts falling within each category.
[17] For example, the Tribes conceded that beds where the substrate has been created artificially fall within this category, as do beds of shellfish not indigenous to the area (e.g., Pacific oysters outside the Hood Canal).
[18] Beds created or enhanced through such techniques will hereinafter be referred to as "de facto artificial beds."
[19] Although the parties presented significant evidence on this issue, none of the evidence was particularly helpful to the Court.
[20] The magnitude of the windfall would be reduced as a result of the Tribes' concession that it would be appropriate to require them to pay the Growers fifty percent of the costs of enhancement in return for a fifty percent allocation of the enhanced shellfish take. The Court does not believe, however, that such a solution adequately balances the hardships between the Tribes and the Growers.
[21] Implementation Plan, § 6.3.
[22] This definition corresponds with the relief provided for tribal harvest of anadromous fish: the court defined the harvestable number of fish in terms of that amount that would not impair the amount of fish needed to maintain the run at existing levels. See generally Washington I, 384 F.Supp. at 405-407, 409, 417.

This definition, however, is intended to apply to the order sharing shellfish harvests, not to change existing standards regarding the limited application of state laws to treaty Indians exercising treaty fishing rights.
[23] Where a shellfish bed straddles publicly and privately owned land, the provisions of this section apply to the shellfish on public land only.
[24] For purposes of this Implementation Plan, "public land(s)" means any land owned by the State, or any of its subdivisions or agencies, unless such land is being leased to a Shellfish Grower.
[25] The relief provided in the above section applies to all shellfish species located on or in all public owned lands, (such as clams, oysters, geoduck clams, and mussels that are embedded in or attached to public owned lands), and to all mobile shellfish species that live in the waters of the State, (such as crab, shrimp, sea cucumber, sea urchin, squid, octopus, and others).

Separate provisions of the Implementation Plan define the State's role in tribal harvest of shellfish on private tidelands, or commercial Shellfish Grower lands.
[26] As indicated in § 7, such interim and long-term management plans shall also contain provisions specifically applicable to harvest from noncommercial, privately owned tidelands.
[27] To the extent the parties have already entered interim agreements, those agreements have the same status as future management plans or agreements under this Plan.